EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Asociación Residentes Urb. Sagrado Corazón, Inc.<br><br>Demandante-Recurrida<br><br>v.<br><br>Juan A. Arsuaga Álvarez<br><br>Demandado-Peticionario | Certiorari<br><br>2003 TSPR 141<br><br>160 DPR _____ |

Número del Caso: CC-2001-939

Fecha: 24 de septiembre de 2003

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Panel integrado por su Presidente Interino, el Juez González Román, y los Jueces Aponte Jiménez y Sánchez Martínez

Abogado de la Parte Peticionaria:
                    Por Derecho Propio

Abogados de la Parte Recurrida:
                        Lcdo. Manuel Durán Rodríguez
                        Lcdo. Ramón Bordelies Díaz

Materia: Cobro de Dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación Residentes Urb.
Sagrado Corazón, Inc.

    Demandante – Recurrida

       vs.                  CC-2001-939       CERTIORARI

Juan A. Arsuaga Álvarez

    Demandado – Peticionario

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 24 de septiembre de 2003

El 10 de febrero de 2000 la Asociación de Residentes de la Urbanización Sagrado Corazón, Inc. (en adelante "la Asociación") presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda contra el señor Juan Arsuaga Álvarez (en adelante "Arsuaga Álvarez") en virtud de la Regla 60 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III R.60. En la misma se alegó que Arsuaga Álvarez le adeudaba a la Asociación dos mil ochocientos cincuenta y siete dólares ($2,857.00), por concepto de cuotas de mantenimiento del sistema de control de acceso en vigor en la referida Urbanización. Arsuaga Álvarez contestó la demanda, solicitando que el caso se convirtiera en uno ordinario en cobro de dinero.

Alegó, además, que nunca había prestado su autorización para el cierre de la urbanización y que tampoco se había comprometido a participar económicamente en la implantación del mismo por lo que negó que adeudara cantidad alguna a la Asociación.

Habiendo ordenado el tribunal de instancia que el caso se tramitara por la vía ordinaria, se efectuó el descubrimiento de prueba. A raíz del mismo las partes sometieron el caso ante el foro de instancia mediante una estipulación de hechos. De la misma surge que para 1980 Arsuaga Álvarez, adquirió junto a su entonces esposa, la señora Ada Morales (en adelante "Morales"), la propiedad objeto del pleito ubicada en la Urbanización Sagrado Corazón de Río Piedras. Para esta fecha la referida urbanización no tenía sistema de acceso controlado. En octubre de 1986, Arsuaga Álvarez se separó de su esposa y se fue a vivir a casa de su madre en Hato Rey. Tanto Morales como los cuatro hijos habidos en el matrimonio permanecieron en la casa ubicada en la Urbanización Sagrado Corazón. Mediante sentencia dictada el 8 de marzo de 1990 quedó disuelto el matrimonio Arsuaga Álvarez-Morales, quedando pendiente la  división de la sociedad legal de bienes gananciales que rigió mientras estuvieron casados.

Así las cosas, el 7 de noviembre de 1993 Morales prestó su autorización para el establecimiento de un sistema de control de acceso en la Urbanización Sagrado

Corazón. Ello lo hizo consignando su firma en un documento juramentado titulado "Certificado de Aceptación/Adopción" en el cual compareció como soltera, mayor de edad y en el que aseguró haber recibido copia del dictamen preliminar emitido por el Municipio de San Juan relativo a los trámites del cierre de la Urbanización. Indicó, además, que no tenía objeción para que se dictara resolución final implantando el sistema de control de acceso. El peticionario Arsuaga Álvarez nunca fue informado y/o notificado  por la Asociación, ni por Morales, de la intención de cerrar la referida Urbanización ni de la autorización prestada por Morales.

El 1ro de febrero de 1994 el peticionario Arsuaga Álvarez se mudó nuevamente a la casa objeto del litigio ubicada en la Urbanización Sagrado Corazón. A esa fecha ya la referida Urbanización tenía acceso controlado, el cual había sido aprobado por el Municipio de San Juan, primero, mediante dictamen preliminar de 15 de octubre de 1993 y, luego, mediante resolución final de cierre.[1] Debe señalarse que las partes estipularon que no existe documento alguno firmado por Arsuaga Álvarez en el que éste haya autorizado el cierre de la Urbanización o en el que se hubiese obligado al pago  del mantenimiento del sistema de control de acceso.

---

[1] El referido cierre de la Urbanización Sagrado Corazón no estaba inscrito en el Registro de la Propiedad para la fecha de los hechos que aquí narramos.

Al poco tiempo de regresar a la casa de Sagrado Corazón, Arsuaga Álvarez comenzó a recibir cartas de la Asociación, en cobro de la cuota de mantenimiento del sistema de cierre. Éste contestó las mismas expresando que aceptaría pagar dichas cuotas <u>siempre y cuando</u> le mostraran evidencia de la deuda y de su obligación de pagarla.

El 20 de marzo de 1995 el Tribunal de Primera Instancia, Sala Superior de San Juan, dictó sentencia en la que dividió la sociedad legal de gananciales que existió en el matrimonio Arsuaga Álvarez-Morales. Como parte del pleito de división de gananciales se solicitó del tribunal que ejecutara la sentencia y ordenara la venta en pública subasta de la casa de Sagrado Corazón. Para evitar perder esta propiedad, Arsuaga Álvarez acordó comprarle a Morales su 50% de participación en la misma, acuerdo que fue recogido mediante resolución emitida por el tribunal de instancia el 6 de agosto de 1999.

Los hechos anteriormente expuestos fueron, <u>repetimos</u>, estipulados ante el foro primario. Luego de que las partes presentaran ante dicho foro judicial memorandos de derecho, en apoyo de sus respectivas contenciones, mediante sentencia a esos efectos el tribunal de instancia declaró <u>sin</u> lugar la demanda incoada por la Asociación.

En síntesis, el referido foro judicial sostuvo que Arsuaga Álvarez no era responsable del pago de cuotas de mantenimiento del sistema de control de acceso ya que

siendo copropietario de la casa tenía que haber prestado su autorización para el establecimiento del mismo. Expresó, además, que sabiendo la Asociación que Arsuaga Alvarez era condueño de la casa debió informarle sobre sus intenciones de cerrar la Urbanización y obtener su anuencia. Por otro lado, manifestó, que luego de decretado el divorcio, Morales no tenía autoridad alguna para obligar al peticionario a aceptar el cierre ni al pago de la cuota.

Insatisfecha con dicho dictamen, el 2 de mayo de 2001, la Asociación acudió ante el Tribunal de Circuito de Apelaciones mediante recurso de apelación.[2] Mediante sentencia emitida el 10 de octubre de 2001 el Tribunal de Circuito de Apelaciones revocó parcialmente la sentencia dictada por el foro primario. Al así resolver, sostuvo que el peticionario tenía razón al interpretar la Sec. 64a(c) de la Ley Núm. 21 de 20 de mayo de 1987,[3] a los efectos de que la misma requiere la autorización de todos los propietarios de una vivienda. Dicho foro expresó que como Arsuaga Álvarez no firmó el permiso debe entenderse que,

---

[2] En síntesis, la Asociación alegó que el foro primario había errado al determinar: (i) que la autorización del sistema de control de acceso requería la firma de todos los titulares del inmueble; (ii) que el documento de aceptación tenía que hacer referencia a la obligación de pago; (iii) al no establecer que el hecho de la adquisición del inmueble, por sí solo, era suficiente para obligar al pago.

[3] Mejor conocida como la Ley de Control de Acceso, 23 L.P.R.A. sec. 64 et seq.

en lo que respecta a su participación en el inmueble, no autorizó el control de acceso ni se comprometió a contribuir económicamente al mantenimiento del mismo. Por otro lado, sostuvo que, a tenor con la Sec. 64d-3(a)(3) de la referida Ley, Arsuaga Álvarez estaba obligado al pago de la cuota de mantenimiento por el sistema de control de acceso, en cuanto a la participación que éste adquirió de su ex-esposa, luego de establecido el control de acceso en la urbanización. Ello, tras haberse determinado que Morales, como copropietaria del inmueble, autorizó válidamente la implementación del control de acceso obligando, así, al pago de la cuota en cuanto a su participación. No obstante, resolvió que el peticionario podía oponerse al pago de las cuotas de mantenimiento en cuanto a la participación de la que siempre fue dueño.

Inconforme con la actuación del tribunal apelativo intermedio, Arsuaga Álvarez acudió por derecho propio --vía certiorari-- ante este Tribunal. Alega que procede revocar la sentencia emitida por el tribunal apelativo debido a que dicho foro incidió:

> ... al determinar que el Recurrente está obligado según la Ley 21, Ley de Control de Acceso, al pago de la cuota de mantenimiento por el control de acceso en cuanto a la participación adquirida por éste de su ex-esposa, Sra. Morales.

El 25 de enero de 2002 expedimos el recurso. Contando con la comparecencia de ambas partes, y estando en

posición de resolver el recurso radicado, procedemos a así hacerlo. Revocamos. Veamos por qué.

I.

El propósito de proveerle a nuestro País un mecanismo adicional para combatir la criminalidad y de promover la participación activa de la ciudadanía en la lucha contra el crimen, llevó a nuestra Asamblea Legislativa a aprobar, el 20 de mayo de 1987, la Ley Núm. 21, ante, sobre control de acceso y uso público de áreas residenciales.[4] Esta pieza legislativa persigue, además, mejorar la seguridad y tranquilidad de las comunidades procurando así una mejor convivencia e interacción comunitaria. Asoc. Res. Vec. Altamesa Este v. Mun. de San Juan, 140 D.P.R. 24, 30 (1996); Caquías Mendoza v. Asoc. Res. Mansiones de Río Piedras, 134 D.P.R. 181, 186 (1993).

En esta Ley se dispuso un procedimiento mediante el cual las personas que residan en urbanizaciones, comunidades o calles, cuyas vías públicas no sean utilizadas como acceso de entrada o salida a otras comunidades, puedan solicitar y obtener autorización para establecer un sistema de control de acceso a las calles que se encuentran dentro de su área residencial. 23 L.P.R.A. sec. 64. A través de la misma se delegó en los municipios --con el asesoramiento de la Junta de

---

[4] Véase, Exposición de Motivos de la Ley Núm. 21 de 20 de mayo de 1987, Leyes de Puerto Rico, pág. 67.

Planificación de Puerto Rico-- la facultad de reglamentar y conceder los permisos y autorizaciones para el control de acceso de vehículos de motor y el uso público de las calles.[5] *Ibid*. Ello conforme a los procedimientos, requisitos y criterios reseñados en la propia Ley y en el Reglamento de Planificación Núm. 20 de 20 de enero de 1989, titulado Reglamento de Control de Tránsito y Uso Público de Calles Locales.[6] Véase: Asoc. Pro Control de Acceso Calle Maracaibo v. Cardona Rodríguez, 144 D.P.R. 1, 26 (1997); Asoc. Res. Linda Gardens v. Mun. de Guaynabo, 138 D.P.R. 925, 930 (1995).

Del mismo modo, la Ley faculta a las asociaciones de residentes para que luego de organizadas y registradas en el Departamento de Estado, como instituciones sin fines de lucro, se encarguen de la administración y mantenimiento de los sistemas de control de acceso. 23 L.P.R.A. 64a(a) y

---

[5] Dicha delegación en los municipios fue introducida como una enmienda a la Ley Núm. 21, ante, a través de la Ley Núm. 156 de 10 de agosto de 1988. Originalmente, la facultad para conceder las referidas autorizaciones residía en la Junta de Planificación.

[6] La Ley Núm. 21, ante, dispone entre otras cosas: los requisitos necesarios para solicitar y obtener los permisos para controlar el acceso, 23 L.P.R.A. sec. 64a; las notificaciones requeridas para efectuar el trámite de cierre, 23 L.P.R.A. sec. 64b; las consecuencias de violar o incumplir con los requisitos establecidos en la ley, 23 L.P.R.A. sec. 64d; los requisitos para inscribir el control de acceso en el Registro de la Propiedad como un gravamen real sobre el inmueble, 23 L.P.R.A. sec. 64d-1 y el proceso para cancelar dicha inscripción, 23 L.P.R.A. sec. 64d-2; las personas obligadas a contribuir económicamente en el mantenimiento del sistema de control de acceso, 23 L.P.R.A. sec. 64d-3.

64d-3(a). Ahora bien, la delegación efectuada por la Legislatura a estas asociaciones es limitada y siempre debe interpretarse conforme al ordenamiento vigente, al propósito de la ley, y en consideración a la naturaleza de los bienes involucrados y los derechos constitucionales de todas las partes afectadas. Asoc. Pro Control de Acceso Calle Maracaibo v. Cardona Rodríguez, ante, a la pág. 28.

Si bien la Ley Núm. 21, ante, promueve el establecimiento de control de acceso en las urbanizaciones y provee los mecanismos para facilitar dicho trámite, es preciso advertir que también enfatiza la importancia y el respeto que merece la opinión de aquellos propietarios que se oponen a la implantación del control de acceso o a sus términos. Cónsono con lo anterior, en Caquías Mendoza v. Asoc. Res. Mansiones de Río Piedras, ante, manifestamos que:

> La delicada política pública tras este ordenamiento requiere armonizar el interés de los ciudadanos en su seguridad y bienestar con los derechos de propiedad y libertad de otras personas, así como de aquellos residentes que se oponen al control de acceso o a sus términos. Tanto la Ley Núm. 21...como el reglamento de la Junta de Planificación...y las ordenanzas municipales que la implantan, intentan armonizar estos intereses. Ibid. a las págs. 186-87.

Tenemos pues que tanto la Ley Núm. 21, ante, según enmendada, por las Leyes Núm. 156 de 10 de agosto de 1988 y Núm. 22 de 16 de julio de 1992, como el Reglamento Núm. 20, ante, consagran el derecho de los residentes a oponerse al control de acceso. Dichos residentes no están

obligados a pagar las correspondientes cuotas para el establecimiento, operación, mantenimiento o remoción del sistema. 23 L.P.R.A. sec. 64g;[7] Sección 10.01 del Reglamento Núm. 20, ante. Tampoco están obligados a pertenecer a la asociación de residentes, aunque sí tienen voz y voto en las reuniones que ésta celebre. Además, tienen derecho de acceso al área controlada bajo las mismas condiciones que los residentes que hayan favorecido el control de acceso. 23 L.P.R.A. sec. 64g; Sección 10.02 del Reglamento Núm. 20, ante. Cuando se solicite del municipio el permiso para implantar el control de acceso, la Ley exige que la asociación de residentes garantice este último derecho. Sección 5.03(8) del Reglamento Núm. 20, ante.[8]

---

[7] Esta Sección, específicamente, dispone que:

> Los propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso no estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema excepto en aquellos casos en que se comprometan a dichos pagos mediante contrato escrito. Cuando así se comprometan, estos propietarios estarán sujetos a las obligaciones y disposiciones de la sec. 64d3 de esta ley. Todo propietario o residente tendrá acceso al área sujeta al control de acceso en igualdad de condiciones y todo propietario podrá participar con voz y voto en las asambleas generales que celebre el Consejo, Junta o Asociación de Residentes, independientemente de que sea o no miembro de dicho organismo.

[8] La Sec. 5.03(8) del referido Reglamento explícitamente impone el siguiente requisito para solicitar el permiso:

(Continúa . . .)

A tenor con lo anterior, en <u>Caquías Mendoza</u> v. <u>Asoc. Res. Mansiones de Río Piedras</u>, ante, a la pág. 212, expresamos que el efecto de las anteriores disposiciones es:

> [Q]ue los vecinos que se opongan al sistema de control de acceso ten[gan] exactamente los mismos derechos que los vecinos que ... apoya[n] el sistema y que contribuy[en] económicamente a su mantenimiento. Esto puede parecer injusto para aquellos residentes que apoyan la gestión. También puede prestarse a abuso por parte de residentes que, de mala fe, se opongan a la implantación del sistema de control de acceso para no tener que contribuir económicamente a su mantenimiento pero que en realidad desean la seguridad y tranquilidad que éste ofrece. No obstante, ese es el balance que nuestro legislador estimó adecuado para proteger los intereses en conflicto.

De todo lo anterior, y a los fines de brindar una solución justa a la controversia que hoy tenemos ante nuestra consideración, debemos tener presente el derecho de aquellos que se oponen al cierre y "la importancia que tiene dentro de esta legislación <u>equiparar y proteger</u> los derechos de todas las partes involucradas." <u>Asoc. Res. Vec. Altamesa Este</u> v. <u>Mun. de San Juan</u>, ante, a la pág. 35 (énfasis nuestro).

---

Garantía de que se le proveerá acceso por igual y en todo momento a todos los residentes de la comunidad, incluyendo a los que no favorezcan el establecimiento de los controles propuestos.

II

Para determinar si el peticionario Arsuaga Álvarez viene obligado a contribuir económicamente con el sistema de control de acceso establecido en su Urbanización, es menester dilucidar dos aspectos importantes. En primer lugar, si la autorización ofrecida por la señora Morales, consintiendo a la implantación del control de acceso, fue una válida y suficiente de acuerdo a la Ley Núm. 21, ante, y si la misma obliga al peticionario. Por otro lado, debemos resolver si la Sección 64d-3(a)(3) de la referida Ley es aplicable al peticionario a los fines de obligarlo a contribuir económicamente al mantenimiento del sistema de control de acceso. Veamos.

A

Como señalamos previamente, la señora Morales ofreció su consentimiento por escrito para que se dictara resolución final implantando el control de acceso en la Urbanización Sagrado Corazón. La Asociación aquí recurrida arguye que dicha autorización era válida y suficiente conforme a la Sección 64a(c) para cumplir con los requisitos exigidos por la Ley para solicitar y obtener el permiso para el cierre y para sujetar el inmueble al pago de cuotas de mantenimiento del sistema.

La referida Sección 64a(c) dispone, en lo pertinente, que:

A los fines de poder solicitar y obtener el permiso a que se refiere la sec. 64 de este título, se deberá cumplir con los siguientes requisitos:
...
(c) Que la solicitud de autorización para controlar el acceso o los accesos a la urbanización, calle o comunidad sea adoptada por lo menos por tres cuartas 3/4 partes de los propietarios de las viviendas allí establecidas. La participación de dichos propietarios estará limitada a un propietario por vivienda y deberá constar por escrito bajo la firma de cada uno de ellos. Una autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad prestada voluntariamente por un propietario mayor de edad y en representación de una vivienda obligará al propietario a cumplir con lo dispuesto en la sec. 64d-3 de este título. ... 23 L.P.R.A. sec. 64a(c).

La Asociación sostiene que siendo Morales propietaria del inmueble, y requiriendo la Ley la participación de <u>un solo propietario por vivienda</u>, su autorización era suficiente para actuar <u>en representación de tal inmueble</u>, sujetándolo al pago de gastos de mantenimiento del sistema. La Asociación aduce que dicha autorización no sólo es válida, sino que también tuvo el efecto de obligar y/o comprometer al peticionario Arsuaga Álvarez a contribuir económicamente a los gastos del sistema.

Por su parte, Arsuaga Álvarez arguye que aun cuando la Ley dispone que la participación será de un solo propietario por vivienda, siendo él copropietario de la misma requería ser notificado, consultado de la intención de establecer el sistema de cierre y debía prestar su aceptación al mismo. Sostiene que en vista de

que Morales sólo es copropietaria del inmueble no podía con su sola autorización representar la vivienda, ni comprometerlo a contribuir al mantenimiento del sistema. Aduce que debido a la insuficiencia de dicha autorización debe entenderse que la vivienda o inmueble no ha prestado su aceptación para el cierre y, por lo tanto, no está sujeta al pago de gastos que genere el control de acceso.

De entrada, resulta esencial advertir que la autorización ofrecida por Morales ocurrió luego de dictada la sentencia de divorcio entre ésta y Arsuaga Álvarez, pero antes de efectuarse la liquidación de la sociedad legal de gananciales que existió durante el matrimonio.

Como es sabido, una vez disuelto el matrimonio, desaparece la sociedad legal de gananciales. Artículo 1315 del Código Civil, 31 L.P.R.A. sec. 3631. Es entonces cuando nace una comunidad de bienes de la cual los ex-cónyuges son comuneros hasta que se liquide la sociedad. Bidot Almodóvar v. Urbino Valle, res. el 13 de diciembre de 2002, 2002 TSPR 151; Soto López v. Colón Meléndez, 143 D.P.R. 282, 287 (1997); García López v. Méndez García, 102 D.P.R. 383, 395 (1974). De este modo, los ex-cónyuges pasan a ser copartícipes de una comunidad de bienes ordinaria en la que por más que se prolongue el estado de indivisión "se tratará en todo caso de una masa en liquidación." González Cruz v. Quintana Cortés, 145 D.P.R. 463, 469 (1998); Soto López v. Colón Meléndez, ante; García González v. Montero Saldaña, 107 D.P.R. 319, 331-32

(1978); J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1967, T.IV, Vol.1, pág. 784.[9] Esta comunidad de bienes, que se supone sea administrada por ambos ex-cónyuges,[10] no se rige por las normas de la sociedad legal de gananciales que hasta entonces le aplicaban a los bienes de los cónyuges sino por las de comunidad de bienes, que a su vez, en ausencia de contrato o disposiciones especiales, está gobernada por los Artículos 326-340 del Código Civil, 31 L.P.R.A. secs. 1271-1285. Bidot Almodóvar v. Urbino Valle, ante; González Cruz v. Quintana Cortés, ante, a las págs. 469-70; Calvo Mangas v. Aragonés Jiménez, 115 D.P.R. 219, 228 (1984).

Es en este contexto en el que la controversia de autos debe ser analizada. En consecuencia, para determinar la validez de la autorización prestada por Morales no sólo nos corresponde imprimirle una interpretación adecuada y razonable a la Sección 64a(c), sino, que además, debemos armonizarla con las normas establecidas en nuestro

---

[9] Con relación al régimen que prevalece luego de disuelto el matrimonio y previo a la liquidación de la sociedad de gananciales, Díez-Picazo y Gullón comentan que:

"[E]stamos en presencia de un patrimonio colectivo o comunidad de bienes cuya naturaleza se transforma. Es un patrimonio formado por los bienes que fueron gananciales, cuya titularidad ostentan los cónyuges..." L. Díez Picazo y A. Gullón, Sistema de Derecho Civil, 2da. ed., Madrid, Ed. Tecnos, 1982, Vol. IV, pág. 272.

[10] Véase, Alameda Martínez v. Registrador, 76 D.P.R. 230, 240 (1954).

ordenamiento jurídico relativas al régimen de comunidad de bienes. Ello, claro está, sin desvirtuar los propósitos que persigue la Ley Núm. 21, ante, que, como ley especial, rige la controversia, y teniendo siempre presente que cualquier deficiencia o laguna que en ella exista será suplida por las disposiciones del Código Civil. 31 L.P.R.A. sec. 12.[11]

Nuestro ordenamiento jurídico dispone que existe una comunidad "cuando la propiedad de una cosa o de un derecho pertenece pro indiviso a varias personas." 31 L.P.R.A. sec. 1271. Esto es, se trata de una situación en que dos o más personas son titulares de un mismo derecho, o lo que es lo mismo, cuando un derecho o conjunto de derechos están atribuidos a una pluralidad de sujetos, correspondiéndoles en común. F. Puig Peña, Compendio de Derecho Civil Español, 3ra. ed. rev., Madrid, Ed. Pirámide, 1976, T.II, pág. 259; J. Castán Tobeñas, Derecho Civil Español Común y Foral, 13ra. ed. rev., Madrid, Ed. Reus, 1987, T.II, Vol.1, pág. 449.

Cuando hablamos de comunidad nos referimos a un concepto genérico ya que el mismo puede recaer sobre toda clase de derechos. Es por ello que cabe hablar de comunidad de bienes y comunidad de derechos. J. Vélez Torres, Curso de Derecho Civil, San Juan, 1983, T.II, pág.

---

[11] La referida sección del Código Civil dispone que: "[e]n las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título."

143; J. Puig Brutau, Fundamentos de Derecho Civil, 3ra. ed., Barcelona, Ed. Bosch, 1979, T.III, Vol.II, págs. 5-6. Ahora bien, en el presente caso nos enfocamos en la copropiedad o condominio que no es otra cosa que la comunidad aplicada al derecho de propiedad. Castán Tobeñas, Derecho Civil Español Común y Foral, ante, a la pág. 510. Esto es, cuando la propiedad de una cosa corporal pertenece a una pluralidad de personas, convirtiéndose en co-titulares de ésta por cuotas cualitativamente iguales. E. Vázquez Bote, Derecho privado puertorriqueño, San Juan, Ed. Butterworth de Puerto Rico, 1993, Vol. VIII, pág. 9.[12]

En aquellos casos en que los sujetos de la copropiedad sean ex-cónyuges la participación de éstos en dicha comunidad será por partes iguales. Calvo Mangas v. Aragonés Jiménez, ante, a la pág. 228. Con relación al uso que cada comunero le pueda dar a la cosa común se ha expresado que el mismo no puede efectuarse de tal manera que perjudique a los demás condueños y al interés de la comunidad.[13] Soto López v. Colón Meléndez, ante, a la pág. 289. Ello, porque en la copropiedad el interés tutelado es el interés colectivo al cual queda sometido el interés

---

[12] Véase, además: Kogan v. Registrador, 125 D.P.R. 636, 651-52 (1990); Daubón Belaval v. Srio. de Hacienda, 106 D.P.R. 400, 412 (1977).

[13] 31 L.P.R.A. sec. 1273; Puig Brutau, Fundamentos de Derecho Civil, ante, a la pág. 25.

individual de cada comunero. J. Manresa, Comentarios al Código Civil Español, 8va. ed. rev., Madrid, Ed. Reus, 1976, T.III, pág. 596.

Si bien el ordenamiento jurídico le reconoce a los comuneros facultades plenas sobre su cuota particular,[14] no existe igual libertad de acción con relación a la cosa común. Las facultades que se le atribuyen a los copartícipes sobre la cosa común están necesariamente subordinadas al derecho de todos los demás. Castán Tobeñas, Derecho Civil Español Común y Foral, ante, a la pág. 513. Por tanto, las gestiones relacionadas a la cosa común siempre requerirán cierto grado de acuerdo o acción conjunta entre los copropietarios. De otro modo, podría ocasionársele perjuicio a la comunidad y/o al interés que cada partícipe tiene en la misma.

Ahora bien, las normas referentes a la autoridad que los copropietarios poseen sobre el objeto común varían de acuerdo al acto o gestión que se interese realizar sobre éste. Del mismo modo, la facultad de los comuneros para obligar con sus actos a los demás partícipes de la comunidad difiere dependiendo de si se trata de un acto de conservación, de administración o de alteración de la cosa común.

En primer lugar, en lo referente a actos para la conservación de la cosa común el ordenamiento dispone que

---

[14] 31 L.P.R.A. sec. 1278.

todo copropietario tendrá derecho a obligar a los demás condueños a contribuir con los gastos que genere la conservación de la cosa o derecho común. 31 L.P.R.A. sec. 1274.[15] Por otro lado, si se trata de un acto de administración y mejor disfrute de la cosa común, el mismo sólo obligará a todos los condueños si es ejecutado luego de haberse llegado a un acuerdo por mayoría. 31 L.P.R.A. sec. 1277.[16] Con relación a los actos que conlleven una alteración de la cosa común, se dispone que ninguno de los condueños podrá realizarlos sin el consentimiento unánime de los demás, aun cuando del mismo pudieran resultar ventajas para todos. 31 L.P.R.A. sec. 1276.[17]

En el presente caso no hay duda de que al momento en que Morales prestó su autorización para que se estableciera el sistema de control de acceso existía entre ella y Arsuaga Álvarez un régimen de comunidad con relación al inmueble objeto de la controversia en el cual cada uno poseía un 50% de interés en el mismo.[18] Por tanto, la autoridad que tenía Morales para actuar con relación al

[15] Véase, además: Cabrera v. Morales, 57 D.P.R. 457, 463 (1940); Pueblo v. Pagán, 19 D.P.R. 730, 734 (1913).

[16] Véase, además: De la Fuente v. A. Roig Sucrs., 82 D.P.R. 514 (1957); Gual v. Pérez, 72 D.P.R. 609 (1951); Ríos v. Ríos, 7 D.P.R. 598, 606 (1904).

[17] Véase, además: De la Fuente v. A. Roig Sucrs., ante.

[18] Ello en vista de que para esa fecha, si bien se había dictado la sentencia de divorcio entre ambos aún no se había liquidado la sociedad legal de bienes gananciales.

inmueble y para obligar con sus actos al también copropietario Arsuaga Álvarez estaba limitada por las normas esbozadas previamente. Es por ello que para dilucidar la validez de la autorización prestada por Morales con relación al inmueble es necesario determinar si el acto de autorizar el establecimiento de un sistema de control de acceso constituye un acto de conservación, administración o de alteración de la cosa común.

Como señalamos anteriormente, tratándose de actos que persiguen la conservación de la cosa común el comunero no necesita el consentimiento de los demás copartícipes para ejecutarlo pero puede repetir de éstos la parte correspondiente de los gastos incurridos. Cabrera v. Morales, 57 D.P.R. 457, 463 (1940). Realizar actos que generan gastos de conservación implica efectuar gestiones necesarias para que la cosa no se deteriore ni perezca. Del mismo modo, se trata de actos dirigidos a mantener la utilidad y productividad de la cosa común y procurar que la misma permanezca al servicio del destino al que está afectada. M. Albaladejo, Comentarios al Código Civil y Compilaciones Forales, Madrid, Ed. Revista de Derecho Privado, 1985, T.V, Vol. II, pág. 106. Conlleva gastos necesarios e indispensables "para la conservación de la cosa en buen estado y en forma idónea para servir a su destino." L. Díez Picazo y A. Gullón, Sistema de Derecho Civil, 6ta. ed., Madrid, Ed. Tecnos, 1997, Vol. III, pág. 83.

Los actos de administración de la cosa común que, como dijimos, requieren para su ejecución el acuerdo de los partícipes que representen la mayoría de los intereses que constituyen el objeto de la comunidad, han sido definidos por este Tribunal. En De la Fuente v. A. Roig Sucrs., 82 D.P.R. 514, 522-24 (1957), apoyándonos en la doctrina española manifestamos que:

> [L]os actos de administración son aquellos que se requieren para contrarrestar los efectos de la duración o transcurso del tiempo en el valor de las cosas; son, como se ha dicho, los que salvan el valor presente de una cosa, sin comprometerla para el futuro. Son, también, los que permiten que una cosa se incremente con un valor que las circunstancias permiten aprovechar sin necesidad de exponerse a un riesgo o de sufrir un quebranto.[19]

Es decir, se refiere a actos dirigidos al mero aprovechamiento de la cosa, con resultados transitorios,[20] que no llegan a transformar la sustancia de la cosa; y sólo tienen como objeto regular el uso y el modo de obtener todas aquellas utilidades que la cosa permita, sin detrimento de su natural entidad.[21]

Por otro lado, los actos que conllevan una alteración de la cosa común, los cuales requieren unanimidad para su

---

[19] Véase, además: Padró Collado v. Espada, 111 D.P.R. 56, 73-74 (1981).

[20] Castán Tobeñas, Derecho Civil Español Común y Foral, ante, a la pág. 520; Manresa, Comentarios al Código Civil Español, ante, a la pág. 610.

[21] L. Donderis Tatay, La Copropiedad, Madrid, Ed. Reus, 1933, pág. 114.

validez, también fueron definidos en el caso <u>De la Fuente</u>

v. <u>A. Roig Sucrs.</u>, ante. Allí expresamos que los mismos:

> [S]uponen la producción de un cambio en el uso y disfrute o en la sustancia e integridad de la cosa, que pueden modificar el destino y la naturaleza de ésta y que significa una extralimitación de las facultades que legalmente corresponden a cada propietario. ... [U]na alteración significa un cambio en el destino de la cosa común o una modificación de la forma, la sustancia o la materia de la cosa ... un cambio del estado en que los otros copartícipes creen que la cosa debe permanecer, o una distracción del uso a que éstos quieren que sea destinada ... una desnaturalización del destino y servicio de la cosa indivisa ... un cambio de la esencia o forma de la cosa ... una novedad que pueda modificar y limitar, y, sobre todo, perjudicar la condición o disfrute de la misma para los demás ... un acto que deba ser calificado jurídicamente como acto de disposición y que incluye los de simple intervención de hecho en la cosa común cuando puedan implicar para ésta alteraciones sustanciales ... una obra que modifique la forma o sustancia (especialmente el destino) de la cosa común ... todo acto dispositivo o de gestión que modifique sustancialmente el estado de hecho o de derecho de la cosa de modo que después de él la cosa no pueda decirse que sea como antes era. *Ibid*. a las págs. 524-525 (citas omitidas).

Al examinar qué tipo de acto constituye el prestar

una autorización para que un inmueble quede sujeto a un

sistema de control de acceso, <u>no nos queda otra</u>

<u>alternativa que catalogarlo como uno de administración y</u>

<u>mejor disfrute de la cosa común</u>. No cabe hablar de que el

mismo constituye un acto de conservación ya que el

establecimiento de un sistema como éste no es una gestión

indispensable ni necesaria para evitar el deterioro del

inmueble poseído en comunidad. Por otro lado, <u>no</u> se trata

de una alteración a la cosa común ya que el control de

acceso no implica un cambio en la sustancia ni en el destino del inmueble, como tampoco podría afirmarse que se trata de un acto de disposición.

Siendo ello así, y considerando los propósitos que tuvo el Legislador al diseñar la Ley Núm. 21, ante,[22] no hay duda de que el referido acto constituye uno de administración y mejor disfrute de la cosa común. Definitivamente, la autorización para establecer un sistema de control de acceso es un acto dirigido a incrementar o mejorar el aprovechamiento del inmueble (la cosa común), sin exponerla a riesgo de sufrir quebranto. De ningún modo tiene el efecto de transformar la sustancia de la cosa y sólo va dirigido a regular su uso para derivar un mejor disfrute de la misma.

Como consecuencia de lo anterior, queda claro que la única manera en que un copropietario --como lo sería Morales en el caso de autos-- podía autorizar válidamente el establecimiento de este sistema y así sujetar la cosa común y obligar, con su actuación, a los demás copropietarios, era si ese acto hubiese sido consentido por la mayoría de los partícipes. Es decir, por aquellos que representaban la mayoría de las participaciones en la cosa común.

Según señalamos previamente, en el presente caso tanto Morales como Arsuaga Álvarez tenían un interés

---

[22] Que como vimos, entre éstos se encuentra el mejorar la calidad de vida y la convivencia comunitaria.

idéntico sobre el inmueble en comunidad. Esto es, ambos tenían una porción de 50% sobre el mismo. Por lo tanto, no era posible que ninguno de los dos, por sí sólo, pudiese válidamente efectuar un acto de administración sobre el bien común sin el consentimiento del otro ya que no había manera de que sus participaciones individuales constituyeran una mayoría. En esta circunstancia particular donde no era posible obtener una mayoría por tratarse de dos partícipes con cuotas iguales y donde tampoco se acudió al Tribunal --alternativa provista en el Artículo 332 del Código Civil cuando no se logra mayoría[23]-- el acto de administración requería para su ejecución el acuerdo de ambos copropietarios, y de existir oposición entre ellos, el mismo, no podía llevarse a cabo. Así lo sugiere Albaladejo al manifestar que:

> Si, por el contrario, las cuotas son iguales, entonces es imposible un acuerdo de la mayoría ... Mientras no se acuda al Juez prevalece el *status quo* y, por lo tanto, la postura del que se niega al acuerdo sobre la medida de administración.[24]

Por ello, forzosa resulta la conclusión de que el consentimiento ofrecido por Morales autorizando, en

---

[23] En lo pertinente este Artículo dispone que: "Si no resultare mayoría, o el acuerdo de éste fuere gravemente perjudicial a los interesados en la cosa común, el Tribunal de Primera Instancia proveerá, a instancia de parte, lo que corresponda, incluso nombrar un administrador." 31 L.P.R.A. sec. 1277.

[24] Albaladejo, Comentarios al Código Civil y Compilaciones Forales, ante, a la pág. 406.

representación de la vivienda, la implantación del sistema de control de acceso fue inválido e insuficiente para sujetar el inmueble a dicho sistema y obligar al copropietario Arsuaga Álvarez a los gastos relacionados a éste. "El negocio celebrado sin la cobertura de un acuerdo de la mayoría es un negocio sin el necesario poder de disposición, por lo que en principio, no debe perjudicar o afectar a los demás condueños. [Es un acto] que no despliega eficacia ..." Albaladejo, Comentarios al Código Civil y Compilaciones Forales, ante, a las págs. 413-14 (énfasis nuestro).

Si bien es cierto que en la comunidad de bienes post-divorcio ambos cónyuges son comuneros y coadministradores y su participación en la administración y disfrute de los bienes comunes es un derecho propio,[25] debe respetarse estrictamente el requisito de mayoría para efectuar actos de administración ya que, de otro modo, se perjudicaría el interés de la comunidad. Esto se hace más patente en el presente caso que ni siquiera trata de un acto de administración efectuado sin acuerdo mayoritario por existir oposición de los otros comuneros. En este caso, el copropietario, Arsuaga Álvarez ni siquiera pudo oponerse al mismo ya que no fue informado o consultado de la intención de la Asociación de Residentes de tramitar el control de acceso ni de la autorización prestada por

---

[25] González Cruz v. Quintana Cortés, ante, a la pág. 473; Soto López v. Colón Meléndez, ante, a la pág. 288.

Morales.[26] Ello a pesar de que tanto Morales como la
Asociación tenían conocimiento de que éste seguía siendo

---

[26] Con relación a la importancia que merece el que los
condueños tengan conocimiento del acto de administración
que se intenta realizar y del acuerdo tomado, algunos
tratadistas comentan lo siguiente:

> "El Código requiere un <<acuerdo>>, por lo que
> han de ser citados los comuneros a fin de
> deliberar y tomarlo, en su caso. No es admisible
> que un comunero mayoritario tome por sí y ante
> sí las decisiones que le parezcan oportunas, sin
> oír a los minoritarios y sin tener en cuenta en
> nada sus derechos en la comunidad". L. Díez
> Picazo y A. Gullón, Sistema de Derecho Civil,
> ante, a la pág. 83. "[N]o tiene sentido pretender
> que los demás queden obligados, mientras no se
> les comunique el acuerdo. ... [H]emos de afirmar
> que al comunero al que no se le comunicó el
> acuerdo no se le pueden imponer las consecuencias
> de dicho acto de administración, sino desde que
> se le comunicó. ... [A]l menos el comunero
> minoritario no sufrirá los perjuicios del acto
> tomado sin su consentimiento." Albaladejo,
> Comentarios al Código Civil y Compilaciones
> Forales, ante, a la pág. 407. "Parece lógico que
> si su efecto más importante es la obligatoriedad
> para todos, del acuerdo mayoritario, que todos
> deban tener conocimiento de que el acuerdo se va
> a tomar con el fin de poder expresar su opinión y
> emitir su voto en los asuntos a tratar." J.
> Beltrán De Heredia, La comunidad de bienes en
> derecho español, Madrid, Ed. Revista de Derecho
> Privado, 1954, págs. 314-15.

Aunque estos comentaristas se refieren a la
importancia de que los comuneros minoritarios conozcan del
acto de administración y del acuerdo efectuado por la
mayoría, entendemos que sus pronunciamientos aplican con
mayor fuerza al caso de autos donde el acto fue efectuado
por una comunera que no representaba la mayoría de
intereses en la copropiedad y que ni siquiera consultó con
el otro condueño de su intención de realizar el referido
acto de administración.

Además, es menester recordar que: "La Ley Núm. 21,
... establece que cada propietario ... tiene derecho a que
se le consulte y, de oponerse al cierre, no se le puede
imponer el pago de los gastos de mantenimiento del
(Continúa . . .)

copropietario del inmueble a pesar de que ya no estaba casado con Morales ni vivía en dicha residencia, sino en Hato Rey.

Lo expuesto anteriormente no es incompatible con lo dispuesto en la Sección 64a(c) de la Ley Núm. 21, ante, sino que permite complementar lo preceptuado en dicha Ley. Como vimos, en la referida sección se dispone que la solicitud de autorización para controlar el acceso requiere ser adoptada, por lo menos, por tres cuartas partes de los propietarios de las viviendas allí establecidas. Dispone, además, que la participación de dichos propietarios está limitada a uno por vivienda y que la autorización prestada por un propietario mayor de edad y en representación de una vivienda obligará al propietario a costear los gastos del sistema. 23 L.P.R.A. 64a(c).

La Asociación recurrida erróneamente plantea que como la Ley sólo permite el voto de un propietario por vivienda, la autorización prestada por Morales como copropietaria era suficiente para obligar al inmueble y a Arsuaga Álvarez. Somos del criterio que, de ningún modo puede entenderse que la intención del Legislador al establecer esta limitación era prohibirle a un propietario

cierre." M.J. Godreau, Personalidad jurídica, legitimación activa y propiedad horizontal: capacidad legal de la junta de directores y del presidente para llevar acciones a nombre del condominio, 64 Rev.Jur.U.P.R. 481, 488 (1995) (énfasis nuestro).

su derecho a expresarse o a oponerse al control de acceso. Menos aún si consideramos que ese es, precisamente, uno de los derechos que esta pieza legislativa salvaguarda.

La limitación impuesta a los efectos de que la participación sea de un propietario por vivienda responde al propósito de impedir que pueda obtenerse el 75% exigido por Ley para autorizar el cierre, con un número ínfimo de viviendas.[27] Se trata de una limitación para los que favorecen el cierre. Esto es, al exigir que el voto sea por vivienda se quiso evitar que una minoría de los propietarios de viviendas en una urbanización impusieran su voluntad sobre el resto. Esta interpretación es la más lógica y razonable que puede hacerse de la referida disposición legal.

De ninguna manera el lenguaje de dicha Sección puede implicar que existiendo dos copropietarios con idénticas cuotas sobre un inmueble pueda uno, sin haber llegado a un acuerdo con el otro, someter la vivienda al control de acceso y obligar al otro condueño al pago de gastos. Del mismo texto de la Ley se desprende que el Legislador quiso

---

[27] Cabe destacar, que la propia Asociación de Residentes en su Escrito de Apelación ante el Tribunal de Circuito de Apelaciones calificó como ilógica esa interpretación de la Sección 64a(c) y expresó que: "Si la ley autorizara a firmar a más de una persona por vivienda, asumiendo la existencia de una esposa y esposo únicamente en una propiedad, se obtendría la autorización de cierre, no con la aprobación del 75% de las viviendas (3/4 partes de las viviendas), sino con la aprobación del 37.5% de las viviendas. Lo anterior porque cada propiedad presentaría dos (2) autorizaciones en vez de una." Apéndice V, Petición de Certiorari, a las págs. 38-39.

evitar esa injusticia cuando dispuso que "la autorización ... prestada ... por un propietario mayor de edad y <u>en representación de una vivienda</u> obligará al propietario..." 23 L.P.R.A. sec. 64a(c). No cabe duda de que el Legislador <u>estableció un requisito de representación que, necesariamente, supone un acuerdo previo entre los propietarios del inmueble para que luego uno de ellos pueda emitir una sola autorización a nombre de los demás, o lo mismo, que sea representativa de la vivienda.</u>[28] La única manera en que uno de los copropietarios puede ofrecer una autorización que sea representativa de la vivienda, reflejando así la voluntad, el sentir y la aceptación de todos los propietarios de la misma es a través de un acuerdo unánime con éstos, <u>o al menos mayoritario</u>, con relación al establecimiento del control de acceso. Ello, cónsono con las normas expuestas previamente relativas a los actos de administración en una comunidad de bienes, las cuales son aplicables a esta controversia y sirven para complementar lo dispuesto en la Ley Núm. 21, ante. Sólo así un copropietario podría, con su voto o participación, sujetar el inmueble y obligar a

---

[28] Cabe señalar que el concepto "representación" significa que una persona posee autoridad legal o convencional para actuar en nombre de otra, ejerciendo las prerrogativas jurídicas de ésta. J.A. Garrone, <u>Diccionario Jurídico</u>, Buenos Aires, Ed. Abeledo-Perrot, 1988, T.III, pág. 291. Es una institución en virtud de la cual una persona puede realizar un acto jurídico por otra ocupando su lugar. De Pina Vara, <u>Diccionario de Derecho</u>, 13ra. ed., México, Ed. Porrúa, 1985, pág. 428.

los demás dueños a contribuir con el costo del sistema de control de acceso.

Resolvemos, en consecuencia, que la autorización ofrecida por Morales, consintiendo al establecimiento de un sistema de control de acceso, fue un acto unilateral inválido e insuficiente para sujetar el inmueble al sistema de control de acceso y para obligar a Arsuaga Álvarez al pago de los gastos de mantenimiento del mismo; ello por tratarse de un acto de administración sobre un bien poseído en comunidad el cual requería para su ejecución de un acuerdo mayoritario. Como consecuencia, el mismo no constituyó una autorización representativa de una vivienda según lo exigido por la Ley Núm. 21, ante.

III

Lo dispuesto anteriormente no resuelve del todo la controversia que nos ocupa. Es preciso examinar otro argumento de la Asociación recurrida, en el que plantea que, independientemente de que la autorización prestada por Morales fuese o no válida, la Sección 64d-3(a)(3) de la Ley Núm. 21, ante, por sí sola, era suficiente para obligar a Arsuaga Álvarez al pago de cuotas de mantenimiento del control de acceso establecido en la urbanización.

La Sección 64d-3(a)(3) de la referida Ley dispone lo siguiente:

(a)  El Consejo, Junta o Asociación de Residentes está facultada para imponer una cuota para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso, incluyendo los salarios o jornales del personal contratado. Asimismo, está facultada para cobrar dicha cuota y reclamar la deuda a un propietario por este concepto por la vía judicial.

La obligación de pago recaerá en los siguientes propietarios:

...

(3) Todo propietario adquirente de una finca, ubicada en una urbanización, calle o comunidad que ha sido autorizada por el municipio correspondiente para controlar el acceso o que, a la fecha de la compraventa, se encontrara en trámite de obtener el consentimiento de tres cuartas (3/4) partes de los propietarios y así conste en actas. 23 L.P.R.A. sec. 64d-3(a)(3).[29]

La Asociación arguye que en 1999, cuando Arsuaga Álvarez adquirió el 50% de participación que Morales tenía en el inmueble, éste quedó automáticamente obligado a contribuir al gasto de mantenimiento del sistema de

_____

[29] Véase, además: Caquías Mendoza v. Asoc. Res. Mansiones de Río Piedras, ante, a las págs. 210-11 donde este Tribunal explica que los obligados al pago de instalación, operación y mantenimiento del control de acceso, en virtud de la Sección 64d-3(a), son: "(1) ... los dueños de fincas en que se haya inscrito en el Registro el dictamen del municipio que autorizó el control de acceso; (2) ... los que autorizaron la solicitud para establecer el control de acceso, siempre y cuando el sistema implantado fuese igual en sus términos y condiciones, económicas y de otra índole, al sistema por ellos inicialmente autorizado o (3) ... aquellos que se obligaron posteriormente mediante contrato escrito, y (4) ... los que hayan adquirido su finca luego de implantado el control de acceso o comenzado el trámite para obtener el consentimiento de tres cuartas (3/4) partes de los propietarios residentes para su implantación."(énfasis suplido y notas al calce omitidas).

control de acceso, en vista de que, para esa fecha, el cierre ya se había establecido en la Urbanización. Aduce que Arsuaga Álvarez puede ser catalogado como ese propietario adquirente, contemplado en la antes citada Sección, que compra una finca ubicada en una urbanización que ya ha implantado el control de acceso, y que al momento de adquirirla queda obligado al pago de mantenimiento del sistema.

De entrada, surgen las siguientes interrogantes: ¿Es Arsuaga Álvarez el propietario adquirente al que se refiere la Sección 64d-3(a)(3)? ¿A qué tipo de propietario le es aplicable la Sección 64d-3(a)(3)? ¿Debemos entender que Arsuaga Álvarez adquirió o, lo que es lo mismo, se convirtió en propietario del inmueble en 1999 cuando ya estaba implantado el sistema de control de acceso? Respondemos en la negativa. Veamos por qué.

A

En primer lugar, debemos tener presente que en ningún momento Arsuaga Álvarez ha dejado de ser propietario del inmueble aquí en controversia. Lo fue desde 1980, cuando adquirió junto a su entonces esposa (Morales) la vivienda en la Urbanización de Sagrado Corazón, y continuó siéndolo en 1999, cuando adquirió el 50% de participación de su ex-esposa en la casa como parte del pleito de división de gananciales.

No hay duda que Arsuaga Álvarez, al igual que Morales se convirtieron en propietarios de la casa de Sagrado Corazón cuando compraron la misma en 1980. Ello por pertenecer a la sociedad legal de gananciales, entidad "sui generis" a la que se le atribuyen todos los bienes adquiridos a título oneroso durante el matrimonio, mientras no se compruebe que son privativos de alguno de los cónyuges. Artículos 1301 y 1307 del Código Civil, 31 L.P.R.A. secs. 3641 y 3647.[30]

Del mismo modo, en 1990, cuando el matrimonio Arsuaga Álvarez-Morales quedó disuelto y surgió el régimen de comunidad de bienes, Arsuaga Álvarez continuó siendo propietario del referido inmueble. Ello en vista de que la comunidad de bienes no es sustancialmente distinta de la "propiedad individual, sino sólo una variación o accidente que origina la simultaneidad de varios en el mismo derecho, o sea, una forma de manifestación del dominio con los dos elementos de unidad de la cosa y pluralidad de sujetos, los cuales tengan, aparte de la proporción ideal que les corresponde, iguales facultades dominicales." Ortiz Roberts v. Ortiz Roberts, 103 D.P.R. 628, 631 (1975); Manresa, Comentarios al Código Civil Español, ante, a la pág. 476.

---

[30] Véase, además: González Cruz v. Quintana Cortés, ante, a las págs. 468-69; García González v. Montero Saldaña, ante, a la pág. 330; Betancourt v. Rodríguez, 17 D.P.R. 6, 12 (1911); Blanco v. Registrador, 5 D.P.R. 26, 31 (1903).

Asimismo, se ha dicho que la copropiedad o el condominio "no es un derecho real distinto esencialmente del dominio; es una forma del dominio nada más, un fenómeno que puede afectar al dominio."[31] Es por ello que "existiendo entre cada condómino y la cosa la misma relación jurídica que existe entre el dueño único y ella, pues los condóminos son propietarios de toda la cosa común..." Vázquez Bote, Derecho privado puertorriqueño, ante, a la pág. 9. Mientras dure la indivisión, ninguno de los copropietarios es ajeno a la propiedad de la cosa considerada en su unidad. Puig Brutau, Fundamentos de Derecho Civil, ante, a la pág. 26. En síntesis, tal y como lo expone Manresa, durante la comunidad de bienes, "los comuneros son real y efectivamente propietarios de la cosa común, y tienen por la ley atribuidos todos los derechos privativos del de propiedad en la extensión que integra el concepto jurídico del dominio." Manresa, Comentarios al Código Civil Español, ante, a las págs. 491-92.[32]

---

[31] Castán Tobeñas, Derecho Civil Español Común y Foral, ante, a las págs. 444-45 y Puig Peña, Compendio de Derecho Civil Español, ante, a la pág. 259 n. 1 (citando ambos a De Diego, Instituciones de Derecho civil español, Madrid, 1959, pág. 606).

[32] Véase, además: Beltrán De Heredia, La comunidad de bienes en derecho español, ante, a la pág. 171 donde este autor explica que: "El derecho de propiedad, no está, por tanto, dividido en partes materiales o ideales, sino que cada copropietario tiene un derecho de propiedad *pleno*, en cuanto a extensión, igual al derecho de propiedad exclusivo, cualitativamente. Pero, al estar limitado cada uno de ellos, en su ejercicio, por la coexistencia de otros tantos derechos iguales, resulta diverso

(Continúa . . .)

De la misma manera, cuando en 1999 culminó el procedimiento judicial de división de la sociedad legal de bienes gananciales con la adquisición por parte de Arsuaga Álvarez del 50% que tenía Morales de participación en la casa,[33] éste continuó siendo propietario del inmueble sólo que, desde ese momento, como único titular del mismo.

Vemos, pues, que desde 1980 Arsuaga Álvarez se convirtió en propietario de la referida vivienda y a partir de ese momento nunca dejó de serlo. Lo único que ocurrió a través de los años fue una serie de cambios y modificaciones en la modalidad y forma del dominio, ello de acuerdo a los distintos regímenes a los que estuvo sujeto el inmueble; a saber, la sociedad legal de gananciales, la comunidad de bienes y la propiedad exclusiva. Cabe destacar que en 1980, año en que originalmente Arsuaga Álvarez adquirió el inmueble, la Urbanización Sagrado Corazón aún no había establecido el sistema de control de acceso. Siendo ello así, tenemos que Arsuaga Álvarez es un propietario adquirente de una finca ubicada en una urbanización en la que al momento de él advenir propietario de la misma no se había implantado el referido sistema de cierre.

_____

cuantitativamente, es decir, en cuanto a intensidad del derecho de dominio exclusivo. De este modo, el derecho de propiedad, en la copropiedad, se transforma, por así decir, convirtiéndose en varios derechos de propiedad que coexisten sobre el mismo objeto."

[33] Véase, Resolución emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan el 6 de agosto de 1999, Civil Núm. KAC91-0055.

Habiendo dispuesto que el peticionario es adquirente desde 1980, ¿debemos considerarlo como el propietario adquirente contemplado en la Sección 64d-3(a)(3)?

Como vimos, en la Sección 64d-3(a) se mencionan las personas que están obligadas a contribuir con los costos de mantenimiento del control de acceso y, entre ellas, se incluye en el Inciso (3) a "[t]odo propietario adquirente de una finca, ubicada en una urbanización. ... que ha sido autorizada ... para controlar el acceso ... ." En Caquías Mendoza v. Asoc. Res. Mansiones de Río Piedras, ante, nos referimos a esas personas como "los que hayan adquirido su finca luego de implantado el control de acceso ..." *Ibid*. a  las págs. 210-11 (énfasis nuestro).

Resulta obvio, que ese Inciso (3) se refiere a nuevos propietarios adquirentes. Esto es, se trata de personas que no tienen derecho de propiedad alguno sobre el inmueble y que, cuando lo adquieren, quedan automáticamente obligados a contribuir a los costos de mantenimiento debido a que al momento de la compraventa la urbanización ya tiene implantado el control de acceso o ha comenzado el trámite para obtener el consentimiento de los propietarios. Sólo a éstos se les puede exigir, de modo automático, el pago de gastos de mantenimiento sin oportunidad para oponerse al control de acceso.

Para aquellas personas que ya eran propietarios en una urbanización que originalmente no tenía acceso controlado --a quienes podríamos llamar propietarios

originales-- la Ley Núm. 21, ante, dedica otras secciones en las que les reconoce el derecho a ser informados de los planes de establecer el sistema, a autorizar, oponerse al mismo e inclusive a revocar la autorización prestada.[34] Siendo el lenguaje de la Sección 64d-3(a)(3) uno tendente a implicar que el adquirente de una vivienda en una urbanización donde ya existe acceso controlado, queda automáticamente obligado a contribuir a los gastos de mantenimiento, repetimos, no tenemos duda de que la misma alude o se refiere a nuevos propietarios adquirentes. No podría referirse a los propietarios originales ya que la propia ley no permite que éstos queden automáticamente obligados al pago del mantenimiento del sistema de control de acceso a menos que hubiesen autorizado expresamente el establecimiento del mismo. 23 L.P.R.A. sec. 64g.

Refiriéndose la Sección 64d-3(a)(3) a nuevos propietarios adquirentes, resulta forzoso concluir que la misma no le es aplicable a Arsuaga Álvarez; éste no es "cualquier adquirente" y tampoco es un "nuevo adquirente" según lo contemplado en la referida sección. En 1999 cuando se convirtió en el único titular del inmueble al adquirir la porción que le pertenecía a su ex-esposa --estando ya implantado el sistema de control de acceso en la urbanización--, Arsuaga Álvarez sólo adquirió el dominio exclusivo de un inmueble que era suyo desde 1980

_____

[34] Véase, 23 L.P.R.A. secs. 64, 64(a), 64(b), 64(d), 64d-1, 64d-2, 64d-3, 64d-5, 64g y 64h.

cuando aún no se había establecido el sistema de cierre. La compra por parte de éste de la participación de Morales constituye un mero trámite incidental al proceso de divorcio y división de bienes gananciales que no debe utilizarse como el punto de partida para establecer el momento en que el peticionario advino propietario. Como vimos, el modo de ejercer el dominio o el derecho de propiedad sobre una cosa puede cambiar de forma o modificarse; sin embargo, lo esencial es determinar el momento en que se comenzó a ejercer el mismo, por primera vez, ello independientemente de la manera o modo en que se hizo.

Arsuaga Álvarez, repetimos, advino dueño desde 1980 cuando adquirió junto a Morales la referida vivienda. Fue en ese momento en que ejerció por primera vez su derecho propietario sobre el inmueble y para ese entonces la urbanización aún no tenía acceso controlado. Por tanto, no le aplica la Sección 64d-3(a)(3) a los efectos de quedar obligado a contribuir al costo de mantenimiento por el mero hecho de haberse convertido en titular único del inmueble luego de implantado el sistema.

Arsuaga Álvarez es, precisamente, ese propietario adquirente de un inmueble en una urbanización que, al momento de la adquisición, no tenía acceso controlado y a quien la Ley Núm. 21, ante, le ofrece la oportunidad de prestar su consentimiento para el establecimiento de éste. Del mismo modo, es ese propietario que según lo dispuesto

en la Ley <u>sólo queda obligado</u> a contribuir económicamente al mantenimiento del sistema <u>si autoriza expresamente la implantación del mismo</u>. Es aquél a quien la Ley le reconoce el derecho de oponerse al cierre y de no contribuir con los costos de mantenimiento con su simple silencio[35] y a quien, además, le provee la opción de revocar la autorización si inicialmente la había prestado.

En vista de que Arsuaga Álvarez advino propietario del inmueble cuando todavía no estaba implantado el acceso controlado en la Urbanización Sagrado Corazón; de que no tuvo la oportunidad de autorizar el establecimiento del mismo ya que nunca se le requirió su consentimiento ni se le informó de los planes de establecerlo; y de la insuficiencia de la autorización prestada por Morales, resolvemos que Arsuaga Álvarez no está obligado a contribuir económicamente con los gastos de mantenimiento del sistema de cierre implantado en su Urbanización.

---

[35] Véase, <u>Caquías Mendoza</u> v. <u>Asoc. Res. Mansiones de Río Piedras</u>, ante, a la pág. 213 n.40 donde este Tribunal manifestó: "En su parte pertinente, el inciso c de la Sec. 2 de la Ley Núm. 21, según enmendada, supra, 23 L.P.R.A. sec. 64a(c), dispone que "[a]quellas personas que favorezcan la implantación del sistema deberán hacerlo expresamente y por escrito ...". La Sec. 15 de la Ley Núm. 21, supra, también dispone que aquellos propietarios que no autorizaron expresamente la implantación del sistema no están obligados a sufragar su mantenimiento y operación a menos que se comprometan mediante contrato escrito. Sec. 15 de la Ley Núm. 21, supra. <u>Por lo tanto, el silencio del residente no lo compromete</u>." (énfasis nuestro).

IV

Por los fundamentos que anteceden, procede revocar la sentencia emitida por el Tribunal de Circuito de Apelaciones en el presente caso.

Se dictará Sentencia de conformidad.


                                    FRANCISCO REBOLLO LÓPEZ
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación Residentes Urb.
Sagrado Corazón, Inc.

    Demandante – Recurrida

      vs.                      CC–2001–939        CERTIORARI

Juan A. Arsuaga Álvarez

    Demandado – Peticionario

SENTENCIA

San Juan, Puerto Rico, a 24 de septiembre de 2003

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones en el presente caso.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión disidente. El Juez Asociado señor Hernández Denton disiente sin opinión escrita. El Juez Presidente señor Andréu García no interviene.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asociación de Residentes
Urb. Sagrado Corazón, Inc.

    Demandante-Recurrida

      vs.                     CC-2001-939    Certiorari

Juan A. Arsuaga Alvarez

    Demandado-Peticionario

Opinión Disidente emitida por el JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI.

San Juan, Puerto Rico, a 24 de septiembre de 2003.

En el caso de autos, la ex-esposa del peticionario autorizó el establecimiento de un sistema de control de acceso en la urbanización donde radicaba su residencia mientras estaba pendiente la división de la sociedad legal de gananciales que tuvo constituida antes con éste. Posterior a esa autorización, el peticionario le compró a su ex-esposa el 50% de participación que ella tenía en la residencia en cuestión y la consolidó con su propia participación en dicha propiedad. El peticionario entonces se negó a pagar las cuotas mediante las cuales se mantiene el referido sistema de control de acceso que protege a su urbanización, amparándose para ello en que él no

era responsable de tal pago porque nunca lo autorizó. Declinó así honrar la decisión de su ex-cónyuge en torno a la propiedad que adquirieron mientras estaban casados.

**Aunque el peticionario se beneficia del sistema de control de acceso referido**, la mayoría del Tribunal determina que el peticionario **no está obligado a contribuir nada al pago de sus costos de mantenimiento**. La mayoría entiende que su dictamen brinda "una solución justa a la controversia" del caso, basándose para ello sólo en unas consideraciones técnico-jurídicas.

En mi criterio, sin embargo, la larga y rebuscada opinión de la mayoría del Tribunal en el caso de autos tiene una falla elemental que me obliga a disentir. Según la mayoría, al peticionario no le aplica la disposición de la Ley de Control de Acceso, 23 L.P.R.A. sec. 64 *et seq*, que obliga al pago de cuotas de mantenimiento a los propietarios de residencias si éstas han sido adquiridas luego de haberse implantado en la urbanización el sistema de control de acceso. Aduce la mayoría del Tribunal que el peticionario no es tal "nuevo adquiriente" debido a que él y su esposa habían adquirido conjuntamente el inmueble en cuestión mientras estaban casados, antes de implantarse el referido sistema de control de acceso.

Resulta, no obstante, que en términos estrictamente jurídicos el dueño original de la residencia en cuestión **no era el peticionario ni su esposa** sino **la sociedad de gananciales integrada por ellos**. Desde antaño hemos resuelto que esa sociedad tiene una personalidad jurídica distinta a la de los cónyuges que la constituyen, **por lo que el titular dominical del inmueble adquirido por la sociedad de gananciales aquí era la sociedad**

**misma y no ninguno de sus integrantes**. Tanto es ello así que el inmueble referido no podría inscribirse en el Registro de la Propiedad a nombre de ninguno o de ambos de ellos sino sólo a nombre de la sociedad de gananciales que integraban. Véase, Calvo Mangas v. Aragonés Jiménez, 115 D.P.R. 219 (1984); Durán v. Registrador, 20 D.P.R. 148 (1914); Betancourt v. Rodríguez, 17 D.P.R. 6 (1911).

Por ende, en el caso de autos, fue cuando el peticionario adquirió el 50% de participación de su ex esposa luego de la división de gananciales, que **advino propietario del inmueble por primera vez**. Era, pues, un nuevo adquiriente ya que antes el inmueble no le pertenecía a él sino a la sociedad de gananciales. En estrictos términos jurídicos, se equivoca la mayoría al afirmar que el peticionario era el dueño de la propiedad desde antes de implantarse el sistema de control de acceso.

Como la mayoría ha estimado que el asunto del caso de autos debe resolverse estrictamente a base de consideraciones técnico-jurídicas, entonces debería hacerlo así consistentemente, llevando tal análisis a sus últimas consecuencias, con el inevitable reconocimiento de que el verdadero titular original de la residencia era la sociedad de gananciales en cuestión, o sea, una persona jurídica distinta al peticionario. De ese modo, el peticionario quedaría como lo que es, un nuevo adquirente, sujeto por ello al pago de las cuotas de mantenimiento en cuestión. Así, además, se emitiría un dictamen judicial que, **al menos desde el punto de vista ético**, esté en armonía con la autorización del sistema de control de acceso que dio la ex-esposa del

peticionario, y con los beneficios de seguridad que el peticionario deriva de dicho sistema.

Como la mayoría no dilucida la referida titularidad original como debería ser, yo disiento del dictamen mayoritario.


                                        JAIME B. FUSTER BERLINGERI
                                             JUEZ ASOCIADO