ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| FRANCISCO IVÁN QUIRÓS LÓPEZ; GERARDO ANTONIO QUIRÓS LÓPEZ<br><br>Parte Apelante<br><br><br>v.<br><br><br>UNDARE, INC.; ASOCIACIÓN DE RESIDENTES DE LAS URBANIZACIONES SAN FRANCISCO, SANTA MARÍA, SAN IGNACIO Y EXTENSIÓN SAN IGNACIO<br><br>Parte Apelada | KLAN202500047<br><br>Consolidado<br><br>KLAN202500049 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2020CV02962<br><br>Sala: 901<br><br><br><br>Sobre:<br>Sentencia Declaratoria |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de febrero de 2025.

Comparecieron el Sr. Francisco Iván Quirós López y el Lcdo. Gerardo A. Quirós López, por derecho propio (en adelante, "Apelantes" o "los hermanos Quirós López"), mediante dos recursos de *Apelación* presentados por separado el 17 de enero de 2025 y que posteriormente fueron consolidados. Nos solicitan que revoquemos la *Sentencia Parcial* que emitió el Tribunal de Primera Instancia, Sala Superior de San Juan, el 26 de noviembre de 2024 y notificada el 2 de diciembre del mismo año. Mediante el referido dictamen, el foro primario declaró "No Ha Lugar" la "**Moción de Sentencia por las Alegaciones y/o Sentencia Sumaria**" que presentaron los hermanos Quirós López y "Ha Lugar" la "**Moción para que se dicte Sentencia Sumaria Parcial a favor de UNDARE, Inc.,**" que presentó la Unión de Asociaciones Recreativas de Residentes de las Urbanizaciones San Francisco, Santa María y San Ignacio (en adelante, "Apelado" o "UNDARE") y desestimó la "**Demanda**", con perjuicio.

Por los fundamentos que se exponen a continuación, se *confirma* la *Sentencia Parcial* apelada.

**I.**

Los hermanos Quirós López presentaron una "**Demanda**" sobre sentencia declaratoria contra UNDARE.[1] Mediante la misma, expusieron que el consentimiento que brindó su madre, la señora María Luisa López Ortiz (en adelante, "la señora López Ortiz"), en el año 1995, para autorizar la implantación de un sistema de control de acceso fue inválido e insuficiente en derecho para obligarlos a pagar cuotas de mantenimiento. Alegaron que su madre llevó a cabo un acto de administración que requería para su ejecución el consentimiento de sus hijos, sobre la propiedad situada en el número 213, calle Mimosa de la Urbanización Santa María. Ello, debido a que la propiedad era parte de una comunidad de bienes que surgió tras el fallecimiento de su padre en 1983.

Los Apelantes explicaron que el inmueble pasó a pertenecer en un cincuenta por ciento (50%) a la sucesión de su padre, compuesta por los hermanos Quirós López y en usufructo viudal a su madre, quien a su vez poseía el otro cincuenta por ciento (50%) de participación como codueña de la vivienda que adquirió con su esposo bajo el régimen de la sociedad legal de gananciales. Como consecuencia, arguyeron que el documento que la señora López Ortiz suscribió para consentir el acceso controlado era inválido, pues ésta no poseía una mayoría de participación en la titularidad de la propiedad. Además, de que UNDARE no les notificó sobre el interés de controlar el acceso a la urbanización. Por tanto, solicitaron al tribunal primario que declarara el consentimiento brindado por la señora López Ortiz inválido y se ordenara a UNDARE a eliminar la totalidad de la deuda sobre las cuotas de mantenimiento de sus registros.

Mediante su "**Contestación a la Demanda y Reconvención**", UNDARE negó la mayoría de las alegaciones expuestas en su contra y que el consentimiento brindado por la madre de los Apelantes fuera inválido.[2] Además, adujo que los hermanos Quirós López y la señora López Ortiz no tenían el mismo

---

[1] Para efectos de la relación de hechos que exponemos a continuación, haremos referencia al Apéndice del recurso con el alfanumérico KLAN202500047. *Véase*, Apéndice del Apelante, págs. 1-41.

[2] Íd., págs. 43-53.

interés sobre el inmueble que estaba en comunidad. Afirmó que el consentimiento prestado por la madre de los hermanos Quirós López, que representaba la mayor cantidad de los intereses propietarios sobre el objeto de la comunidad, fue libre y voluntario. Por consiguiente, asegura que cumplió con los requisitos de la entonces vigente Ley de Control de Acceso de 1987, *infra*, y que la deuda generada por el impago de las cuotas de mantenimiento por la cantidad de $125,587.80 era una líquida, vencida y exigible.

En la "**Réplica a Reconvención**", los Apelantes negaron la mayoría de las alegaciones y reafirmaron que nunca fueron consultados, a pesar de ser dueños del cincuenta por ciento (50%) de la propiedad, así como tampoco suscribieron documento alguno que autorizara el control de acceso propuesto. A su vez, reiteraron que su madre no podía brindar sola el consentimiento para el control de acceso. Por consiguiente, la obligación que pretendía cobrar UNDARE no existía, ya que la actuación de la señora López Ortiz no creó obligación jurídica alguna.[3]

Después de varios trámites procesales, los hermanos Quirós López presentaron una "**Moción de Sentencia por las Alegaciones y/o Sentencia Sumaria**".[4] Sostuvieron que no existe controversia en cuanto a que su madre no tenía autoridad en derecho para consentir y sujetar la vivienda en comunidad a un sistema de control de acceso. Esto, debido a que no poseía una participación mayoritaria, sino el mismo interés que los Apelantes, de un cincuenta por ciento (50%) sobre la propiedad común. Por ende, su participación no constituía la mayoría que se requiere que tenga un comunero para llevar a cabo un acto de administración. A la luz de lo anterior, los hermanos Quirós López solicitaron al foro de instancia que decretara "Ha Lugar" la moción.

Por su parte, UNDARE se opuso a la solicitud de los Apelantes, mediante una petición de desestimación de la "**Demanda**".[5] Sostuvo que la moción de sentencia sumaria era improcedente, ya que la relación de los hechos esbozados como incontrovertidos no eran suficientes para que procediera el remedio solicitado. En su opinión, la declaración jurada sometida junto a la solicitud de

---

[3] Íd.
[4] Íd., págs. 57-79.
[5] Íd., págs. 85-101.

sentencia sumaria era para beneficio propio o "self-serving" y no gozaba de confiabilidad ni valor probatorio, pues todavía no se había concluido el descubrimiento de prueba. Indicó, además, que estaba en controversia si los hermanos Quirós López consintieron o no a la implementación del sistema de control de acceso.

UNDARE también presentó una "**Moción para que se Dicte Sentencia Sumaria Parcial a favor de UNDARE, Inc.**".[6] Reiteró que el consentimiento brindado por la señora López Ortiz era válido, ya que estaba plenamente facultada en derecho para ejecutar actos de administración sobre la residencia, toda vez que poseía la mayor cantidad de los intereses sobre el inmueble en comunidad. Por consiguiente, solicitó que el tribunal primario decretara "Con Lugar" su petición y desestimara la "**Demanda**" en su contra.

Examinados los planteamientos de las partes, el foro de instancia consignó las siguientes determinaciones de hechos que acogemos como nuestras en esta *Sentencia*:

1. Francisco A. Quirós Méndez y María Luisa López Ortiz[7] contrajeron matrimonio en San Juan, Puerto Rico el 16 de noviembre de 1950.

2. Los demandantes Francisco Iván Quirós López y Gerardo Antonio Quirós López son los únicos hijos del matrimonio Quirós Méndez-López Ortiz.

3. El 27 de marzo de 1969 los esposos Quirós Méndez-López Ortiz adquirieron la siguiente propiedad inmueble mediante la escritura número 10 sobre compraventa otorgada ante el notario Rafael Pieras Lombardero, en la que posteriormente construyeron una residencia:

URBANA: Solar radicado en el Reparto Santa María del Barrio Monacillos de Rio Piedras, que se marca con el numero treinta y siete (37) en el piano de inscripción con una cabida superficial de mil seiscientos noventa y siete metros cuadrados (1,697.00 m.c.), en colindancias per OESTE su frente en una distancia de veinte metros (20 m.) con la Calle A y en doce metros (12 m.) en forma circular con el arco que forma el final de dicha Calle A; por el ESTE su fondo en una distancia de cuarenta y siete metros (47 m.) con terrenos de Sotero López antes, hoy Sein Realty Company, Inc.; por el SUR su derecha entrando en una distancia de cuarenta y siete punto setenta y ocho metros (47.78 m.) con el solar treinta y ocho (38) del piano de inscripción propiedad de Reparto Santa María Inc.; y por el NORTE su izquierda entrando en una distancia de treinta y

---

[6] Íd., págs. 102-135.
[7] Del expediente surge que la señora López Ortiz también era conocida como Luisa López Ortiz, María L. Vda. De Quirós y María L. Quirós.

ocho punto once metros (38.11 m.) con el solar treinta y seis del piano de inscripción propiedad de Reparto Santa María Inc.

4. Dicha propiedad se adquirió por los esposos Quirós Méndez-López Ortiz bajo el régimen de sociedad legal de gananciales.

5. La dirección física de la propiedad es 213 Calle Mimosa, Urbanización Santa María, San Juan, Puerto Rico 00927.

6. El padre de los demandantes, Francisco A. Quirós Méndez, falleció el 21 de enero de 1983.

7. El 12 de abril de 1983, el Tribunal Superior, Sala de San Juan, emitió Resolución de Declaratoria de Herederos y declaró únicos y universales herederos de Francisco A. Quirós Méndez a sus hijos Francisco Iván Quirós López y Gerardo Antonio Quirós López, y a su viuda, María Luisa López Ortiz, en lo correspondiente a la cuota viudal usufructuaria.

8. En la planilla de contribución sobre caudal relicto de Francisco A. Quirós Méndez presentada ante el Departamento de Hacienda se incluyó la propiedad inmueble sobre la cual se reclama la existencia del control de acceso por parte de UNDARE, la cual se identificó como un bien de naturaleza ganancial y se valoró la participación del causante en 50%.

9. El 23 de enero de 1984 se emitió la Certificación de Cancelación de Gravamen correspondiente al caudal relicto de Francisco A. Quirós Méndez.

10. No hubo liquidación posganancial, ni conmutación de la cuota viudal usufructuaria, ni partición del caudal hereditario del causante Francisco A. Quirós Méndez.

13. UNDARE es una corporación sin fines de lucro debidamente organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico.

14. Luego de la aprobación de la Ley Núm. 21, *supra*, la parte demandada UNDARE le solicitó al Municipio de San Juan autorización para controlar el acceso vehicular y el uso público de sus calles.

15. El 12 de septiembre de 1995 el Municipio de San Juan, aprobó, en calidad de Dictamen Preliminar, la Resolución Número 14, Serie 1995-1996, para autorizar a UNDARE a establecer y administrar un control de acceso vehicular y peatonal para las áreas residenciales de las urbanizaciones Santa María, San Francisco y San Ignacio, entre otras.

16. Dicho Dictamen Preliminar emitido por el Municipio de San Juan establece, entre otros asuntos, lo siguiente:

Sección 13ra: Esta Resolución constituirá un Dictamen Preliminar que deberá ser adoptado mediante declaración firmada por no menos de tres cuartas (3/4) partes de los propietarios dentro de los quince (15) días siguientes a la fecha del archivo en el Municipio de copia de su notificación. La firma de dichos propietarios estará limitada a un propietario por vivienda. El dictamen preliminar adoptando el Control de Acceso con las condiciones impuestas por el Municipio será firme a la fecha del archivo en el Municipio de la declaración antes requerida.

17. Este requisito fue cumplido por UNDARE, según la certificación emitida por el Municipio de San Juan el 16 de mayo de 1996. Por tanto, el Dictamen Preliminar se convirtió en uno Final, haciendo efectivas y obligatorias para UNDARE y para los residentes de las urbanizaciones que aprobaron el dictamen todas las cláusulas y condiciones allí contenidas.

18. Entre los residentes que emitieron su endoso al Dictamen Preliminar se encontraba la señora López Ortiz, madre de los demandantes.

19. El 16 de noviembre de 1995, la señora López Ortiz, firmando como "María L. Vda. de Quirós", suscribió bajo juramento y ante el notario Enrique Rebollo Portela, un Certificado de Aceptación/Adopción mediante el cual se hizo constar lo siguiente:

PRIMERO: Que soy dueño de la residencia Núm. 213 de la Calle Mimosa de la Urbanización Santa María.
SEGUNDO: Que he recibido copia del DICTAMEN PRELIMINAR emitido por el Municipio de San Juan, con fecha 12 de septiembre 1995, respecto al control de acceso de la Urbanización donde ubica mi residencia o propiedad.
TERCERO: Que no tengo objeción a que se implante el proceso de control de acceso, según se establece en dicho dictamen, accediendo a que se dicte RESOLUCIÓN FINAL a este respecto.

20. Para la fecha en que la señora López Ortiz firmó el Certificado de Aceptación/Adopción, la propiedad ubicada en el número 213 de la Calle Mimosa de la Urbanización Santa María pertenecía a la comunidad posganancial del matrimonio Quirós Méndez-López Ortiz, la cual se componía de la señora López Ortiz en un 50% y la sucesión de su difunto esposo en el restante 50%.

21. Para la fecha en que la señora López Ortiz firmó el Certificado de Aceptación/Adopción, la Sucesión de Francisco A. Quirós Méndez que era dueña del 50% de la propiedad estaba compuesta por los dos demandantes y la señora López Ortiz.

22. Por tanto, para la fecha en que la señora López Ortiz firmó el Certificado de Aceptación/Adopción, ella era heredera forzosa y comunera en el patrimonio relicto de su difunto esposo, y tenía un usufructo sobre el 50% que pertenecía a la Sucesión de Francisco A. Quirós Méndez.

23. El 27 de enero de 1998, la señora López Ortiz, firmando como "María L. Vda. de Quirós", suscribió una carta dirigida al Administrador de UNDARE, donde informó lo siguiente:[8]

Estimado señor Administrador:
A tenor con la última decisión del Honorable Tribunal Supremo de Puerto Rico, solicito que se le requiera a cualquier persona que pida entrar por los puntos de acceso de U.N.D.A.R.E., alegando como propósito el visitar mi residencia, la siguiente información, a saber:
  1. Nombre y Apellidos [- María L. López Viuda de Quirós]
  2. Número de tablilla, marca, modelo y color de auto. [Honda Accord 1983, color vino – Tablilla 228468]

---

[8] La comunicación según presentada en el expediente contiene un texto mecanografiado, con anotaciones a mano de la señora López Ortiz, las cuales reproducimos en corchetes para claridad en la presentación de la información.

> Si alguna persona reusase [sic] ofrecer la información o alguna parte de ésta, autorizo a que no se le permita la entrada.
> [Hijos que me visitan frecuentemente
> Francisco I. Quirós López
> Lcdo. Gerardo A. Quirós López]

> 24. La señora López Ortiz falleció el 15 de febrero de 2003 y sus únicos y universales herederos son sus dos hijos, los aquí demandantes, Francisco Iván Quirós López y Gerardo Antonio Quirós López.[9]

En consideración a lo anterior, y luego de aquilatar la prueba documental sometida, el foro *a quo* declaró "No Ha Lugar" la "**Moción de Sentencia por las Alegaciones y/o Sentencia Sumaria**" presentada por los hermanos Quirós López y "Ha Lugar" la petición sometida por UNDARE. En consecuencia, desestimó la "**Demanda**" de epígrafe, bajo el fundamento de que el consentimiento brindado por la madre de los hermanos Quirós López, como titular mayoritaria, fue válido al amparo de la Ley Núm. 21, *infra*, y el derecho aplicable.[10]

Insatisfechos con lo resuelto, los Apelantes presentaron una "**Moción Conjunta de la Parte Demandante Solicitando Reconsideración, Enmiendas a Determinaciones de Hechos, Determinaciones de Hechos Adicionales y Conclusiones de Derecho en la Sentencia Parcial Notificada el 2 de Diciembre de 2024**".[11] Después de examinar la petición de los hermanos Quirós López, el tribunal apelado notificó el 19 de diciembre de 2024 una *Orden* en la que decretó no ha lugar las peticiones.[12]

Aún inconformes, los hermanos Quirós López acudieron ante este tribunal intermedio mediante los recursos de epígrafe. En el caso núm. KLAN202500047, el licenciado Quirós López expuso que el foro de instancia cometió los siguientes errores:

> Cometió grave error de derecho el TPI en la interpretación de las disposiciones del Código Civil, Edición del 1930, sobre la figura de la cuota viudal usufructuaria concediéndole el TPI facultades dominicales o de propietario sobre el caudal hereditario de su difunto esposo, facultades que son erróneas en derecho.

> Cometió grave error de derecho el TPI al haber interpretado y descartado la clara jurisprudencia del Honorable Tribunal Supremo de Puerto Rico sobre el tema del consentimiento necesario y requerido para que un titular de un inmueble en comunidad pueda válidamente comprometer al mismo y a los otros copropietarios al

---

[9] Véase el Apéndice del Apelante, págs. 240-258.
[10] Íd.
[11] Íd., págs. 259-272.
[12] Íd., pág. 273.

pago de una cuota de mantenimiento mensual al haber consentido a la aprobación de un "acto de administración", sin contar con una participación mayoritaria en el bien en comunidad.

La sentencia apelada es errónea en derecho debido a que el TPI interpretó incorrectamente las disposiciones que regulan la figura de la cuota viudal usufructuaria, así como la jurisprudencia del Tribunal Supremo de Puerto Rico sobre lo que se requiere para que válidamente un comunero pueda obligar a los otros comuneros y al bien inmueble por una decisión sobre un "acto de administración" sobre el inmueble tomada por un comunero que no tiene una participación mayoritaria en la comunidad.

Por su parte, el señor Quirós López sostuvo que el TPI cometió los siguientes errores:

Erró el Tribunal de Primera Instancia al considerar en su Sentencia Parcial que la viuda madre de los demandantes, codueña junto a ellos de una propiedad, podía por sí sola representar la mayoría de los comuneros para realizar un acto de administración de la cosa común al autorizar, a nombre de todos pero sin su conocimiento o consentimiento, la implantación de un control de acceso en su urbanización.

Erró el Tribunal de Primera Instancia al no reconsiderar su Sentencia Parcial, no enmendar las Determinaciones de Hechos y no añadir Determinaciones de Hechos adicionales incontrovertidos según le fueron propuestas por los apelantes demandantes.

El 18 de febrero de 2025, el Apelado compareció mediante "**Alegato de la Parte Apelada UNDARE, Inc.**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

## A.

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria. A la luz de sus disposiciones, se dictará sentencia si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal. S.L.G. Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011).

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal tenga ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678. Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. S.L.G. Szendrey-Ramos v. Consejo Titulares, *supra*, pág. 168. Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte promovida por una moción de sentencia sumaria debe demostrar que existe controversia en cuanto a algún hecho material que sea constitutivo de la causa de acción del demandante. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi *et al.*, 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. E.L.A. v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 680; Roldán Flores v. M. Cuebas *et al.*, 199 DPR

664, 677 (2018). Adicionalmente, en León Torres v. Rivera Lebrón, 204 DPR 20, 47 (2020), el Tribunal Supremo resolvió que ninguna de las partes en un pleito puede enmendar sus alegaciones a través de la presentación de una solicitud de sentencia sumaria o su oposición. Así que, según lo expresa el propio tribunal, "la parte que se opone a una solicitud de sentencia sumaria no puede traer en su oposición, de manera colateral, defensas o reclamaciones nuevas ajenas a los hechos consignados en sus alegaciones, según consten en el expediente del tribunal al momento en que se sometió la moción dispositiva en cuestión". Íd., pág. 54.

Según las directrices pautadas por nuestro más Alto Foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. E.L.A., 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. J.A.D.M. v. Centro Com. Plaza Carolina, 132 DPR 785, 802-803 (1993). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, *supra*.

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser de *novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Dr. Bravo, 161 DPR 308, 335 (2004). De modo que las partes que recurren

a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd. En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Íd., págs. 334-335.

En Meléndez González et al. v. M. Cuebas, supra, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar de novo el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, supra, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, supra; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

Conviene destacar desde ahora que el Tribunal Supremo también ha expresado que es desaconsejable utilizar la moción de sentencia sumaria en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia. Ramos Pérez v. Univisión, 178 DPR 200, 219 (2010); Carpets & Rugs v. Tropical Reps, 175 DPR 615, 638 (2009). No obstante, "cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge que no existe controversia en cuanto a los hechos materiales" nada impide que se utilice la sentencia sumaria en casos donde existen elementos subjetivos o de intención. Ramos Pérez v. Univisión de PR, supra, pág. 219.

**B.**

Como es sabido, en cuanto al régimen económico patrimonial que regirá durante el matrimonio, el Código Civil de Puerto Rico establece que, a falta de capitulaciones matrimoniales válidas, el régimen económico patrimonial supletorio

es la sociedad legal de bienes gananciales.[13] <u>Betancourt González v. Pastrana Santiago</u>, 200 DPR 169, 177-178 (2018). Bajo este régimen, los cónyuges figuran como codueños y administradores de todo el patrimonio matrimonial, sin adscribírsele cuotas específicas a cada uno. <u>Montalván v. Rodríguez</u>, 161 DPR 411, 420 (2004).

La sociedad legal de gananciales termina con el divorcio o muerte de uno de los cónyuges, momento en el cual nace una comunidad de bienes post ganancial que regirá hasta la liquidación y división de la antigua sociedad de bienes gananciales. Art. 1315 del Código Civil, 31 LPRA sec. 3681; <u>Residentes Sagrado Corazón v. Arsuaga</u>, 160 DPR 289, 305 (2003); <u>Soto López v. Colón</u>, 143 DPR 282, 287 (1997). Esta comunidad estará integrada por los bienes que conformaban el activo de la masa común al momento de la disolución de la sociedad legal de gananciales. <u>Montalván v. Rodríguez</u>, *supra*, pág. 429.[14]

Nuestro ordenamiento reconoce la existencia de una comunidad cuando la propiedad de una cosa o un derecho pertenece en común proindiviso a varias personas. Art. 326 del Código Civil, 31 LPRA sec. 1271. A su vez, establece una presunción a los efectos de que la participación de los comuneros es por partes iguales tanto en los beneficios como en las cargas mientras no se pruebe lo contrario. Art. 327 del Código Civil, 31 LPRA sec. 1272. <u>Díaz Rodríguez v. García Neris</u>, 208 DPR 706, 716 (2022). Esto quiere decir que "lo generado durante el término de la comunidad en liquidación es por partes iguales, ya que cada comunero participa en los beneficios y cargas de la comunidad en proporción a su cuota". <u>Bidot v. Urbino</u>, 158 DPR 294, 304 (2002). Al utilizar el concepto "beneficios", el Código Civil se refiere al uso y a los frutos del bien comunitario. Por el contrario, las cargas son obligaciones unidas a la propiedad o derecho de que se trate; son las que se imponen al propietario como tal o al titular del derecho en comunidad. <u>Díaz v. Aguayo</u>, 162 DPR 801, 809 (2004).

---

[13] Para propósitos de atender la controversia que tenemos ante nuestra consideración, haremos referencia a las disposiciones del derogado Código Civil de 1930, por estar vigente al momento de los hechos que generaron el pleito de epígrafe. El Código Civil de 1930 fue revocado y sustituido por la Ley Núm. 55-2020, según enmendada, conocida como el "Código Civil de Puerto Rico". Conforme al Art. 1812 del Código Civil de 2020, 31 LPRA sec. 11717, los actos y contratos celebrados conforme al régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos los efectos según la misma […].

[14] Citando *a* J.J. Rams Albesa, <u>La sociedad de gananciales</u>, Madrid, Editorial Tecnos S.A., 1992, pág. 418.

La referida comunidad de bienes post ganancial existe indefinidamente hasta que se liquide la cosa común, a solicitud de cualquiera de las partes. Cruz Pérez v. Roldán Rodríguez *et al.*, 206 DPR 261, 269 (2021). Ello, ya que ninguno de los comuneros está obligado a permanecer en la comunidad de bienes post ganancial, sino que cada uno de ellos puede exigir su liquidación. Art. 334 del Código Civil, 31 LPRA sec. 1279; Muñiz Noriega v. Muñoz Bonet, 177 DPR 967, 983 (2010). Serán aplicables a la división entre los partícipes en la comunidad, las reglas concernientes a la división de la herencia. Art. 340 del Código Civil, 31 LPRA sec. 1285.

## C.

Uno de los modos de adquirir una propiedad es a través de la sucesión, definida como "la transmisión de derechos y obligaciones del difunto a sus herederos". Art. 599 del Código Civil, 31 LPRA sec. 2081. La sucesión comprende tanto los bienes como las obligaciones que existían al momento de la muerte del causante, y que no hayan quedado extintas con la muerte. Arts. 601 y 608 del Código Civil, 31 LPRA secs. 2083 y 2090.

Conforme al Código Civil, un heredero es aquél que sucede a título universal, mientras que un legatario sucede a título particular. Art. 609 del Código Civil, 31 LPRA sec. 2091. Si hay más de un heredero llamado a la universalidad de la herencia, entonces surge una comunidad hereditaria entre ellos. Vega Montoya v. Registrador, 179 DPR 80, 87 (2010). Una comunidad hereditaria se caracteriza por ser universal, pues los herederos son titulares de una cuota abstracta de los bienes que componen la masa patrimonial, y sólo cuando ocurra la partición de la herencia es que se extinguirá la comunidad hereditaria y la titularidad de los herederos recaerá sobre bienes particulares. Íd., págs. 88-89. Por ello, ningún heredero puede reclamar derecho sobre un bien en particular mientras no se haya llevado a cabo la partición. Íd., pág. 89.

Dentro del contexto de la comunidad de herederos, cabe mencionar que la porción conocida como la "legítima" es la parte de los bienes que está reservada para los herederos forzosos. Al palio del Código Civil de 1930, se consideraban herederos forzosos aquéllos para quienes la ley ha reservado una porción específica del caudal hereditario. Art. 735 del Código Civil, 31 LPRA sec. 2361.

Entre éstos se encuentra el cónyuge viudo, quien tiene derecho a la cuota viudal usufructuaria. Arts. 736, 761-766 del Código Civil, 31 LPRA secs. 2362, 2411-2416. Es decir, el cónyuge supérstite no recibe bienes del caudal hereditario en pleno dominio. Santiago Montañez v. Fresenius Medical, 195 DPR 476, 489 (2016). Más bien, su derecho se reduce a lo siguiente: "El cónyuge viudo tendrá derecho a una cuota, en usufructo, igual a la que por legítima corresponda a cada uno de sus hijos o descendientes no mejorados". Art. 761 del Código Civil, 31 LPRA sec. 2411.

A pesar de que la cuota viudal en principio es un usufructo sobre la totalidad de la masa hereditaria, los herederos pueden satisfacer esta legítima mediante la asignación de una renta vitalicia, los productos de determinados bienes o el pago de capital en efectivo. Esta operación se conoce como la conmutación de la cuota viudal. Art. 765 del Código Civil, 31 LPRA sec. 2415; Clavelo Pérez v. Hernández García, 177 DPR 822, 837 (2010). La conmutación, que puede darse antes o en el momento de realizar la partición, se calcula a base de los bienes de la masa hereditaria. Mientras los herederos no efectúen esta operación, el usufructo viudal grava todos los bienes de la masa hereditaria. Calimano Díaz v. Rovira Calimano, 113 DPR 702, 709 (1983). Ahora bien, es menester destacar que todos los bienes que componen la masa hereditaria están gravados por el usufructo viudal. Colón v. Registrador, 114 DPR 850, 858 (1983).

### D.

El Código Civil de 1930 definía el derecho de propiedad como el derecho "por virtud del cual una cosa pertenece en particular a una persona con exclusión de cualquier otra… [y mediante el cual se] concede el derecho de gozar y disponer de las cosas sin más limitaciones que las establecidas en las leyes". Art. 280 del Código Civil de 1930, 31 LPRA sec. 1111. El derecho de propiedad se puede subdividir en tres modalidades: el pleno derecho de disfrutar y enajenar una cosa, el derecho de disfrutar o usar una cosa y el derecho a servidumbres constituidas sobre bienes inmuebles. Art. 281 del Código Civil de 1930, 31 LPRA sec. 1112. Uno de los derechos reales susceptibles a poseerse en comunidad es el derecho de propiedad. Díaz v. Aguayo, *supra*, pág. 808.

Por consiguiente, existe una comunidad de bienes "cuando la propiedad de una cosa o de un derecho pertenece de modo proindiviso a varias personas". Art. 326 del Código Civil, 31 LPRA sec. 1271. No obstante, apunta el profesor Vélez Torres que el concepto de la "comunidad" se refiere a la titularidad conjunta de cualquier derecho, mientras que la "copropiedad" es la titularidad conjunta sobre un derecho de propiedad. J. R. Vélez Torres, Curso de Derecho Civil, 2005, T. II, pág. 144.

A pesar de que varias jurisdicciones han enmarcado el concepto de la comunidad de bienes de manera diferente, el tipo de comunidad que regula nuestro ordenamiento es la llamada comunidad romana, en la que cada titular tiene una cuota ideal o alícuota de la cosa. Vélez Torres, op cit., pág. 145. Se presume que dichas cuotas son iguales y que la participación de los comuneros será proporcional, tanto en los beneficios como en las cargas, a menos que se pruebe lo contrario. Art. 327 del Código Civil, 31 LPRA sec. 1272. Así, ninguno de los comuneros podrá alterar la cosa común sin consentimiento de los demás, aunque dicha alteración resulte ventajosa para todos. Art. 331 del Código Civil, 31 LPRA sec. 1276.

De otro lado, se dispone que cada partícipe de la comunidad podrá servirse de las cosas comunes, siempre que no afecte el interés de los otros codueños ni les impida su uso. Art. 328 del Código Civil, 31 LPRA sec. 1273. Así, se ha interpretado que esta limitación busca prohibir el "uso en beneficio exclusivo de uno de los copropietarios." Díaz v. Aguayo, supra, pág. 810[15]. Por tal motivo, el utilizar o poseer toda la propiedad, excluyendo a los demás comuneros, es equivalente a afectar los intereses de los comuneros al utilizar la propiedad común. Íd. De ello ocurrir, el comunero que se benefició de la propiedad en exclusión a los demás tendrá que compensar a los comuneros afectados. Íd., pág. 811-814.

La facultad de los comuneros para actuar sobre el objeto común y obligar a los demás participantes de la comunidad va a depender de "si se trata de un

---

[15] Cita omitida.

acto de *conservación*, de *administración* o de *alteración* de la cosa común". Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 308 (énfasis en el original).

Nuestro ordenamiento ha dispuesto que un copropietario tiene derecho a obligar a los demás partícipes a que contribuyan a los gastos que genere la conservación de la cosa o derecho común. Art. 329 del Código Civil, 31 LPRA sec. 1274; Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 308. No obstante, cuando se trate de un acto de administración y mejor disfrute de la cosa común será obligatorio únicamente cuando se acuerde por la mayoría de los demás condueños. Art. 332 del Código Civil, 31 LPRA sec. 1277; Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 308. Por último, los actos que conlleven la alteración de la cosa común solo podrán hacerse con el consentimiento unánime de los demás copartícipes. Art. 331 del Código Civil, 31 LPRA sec. 1276; Residentes Sagrado Corazón v. Arsuaga, *supra*, págs. 308-309.

Así pues, los actos de administración de un comunero sobre los bienes de la comunidad serán proporcionales a sus respectivas cuotas. Art. 327 del Código Civil, 31 LPRA sec. 1272. Por tanto, la mayoría a la que se refiere nuestro ordenamiento en lo que respecta a la validez de actos de administración no se determina por la cantidad de titulares del bien o bienes, sino que "por los partícipes que representen la mayor cantidad de los intereses que constituyan el objeto de la comunidad". Art. 332 del Código Civil, 31 LPRA sec. 1277.

De particular importancia al caso que nos ocupa son las disposiciones del Artículo 418 del Código Civil de 1930, cuando dispone que "[e]l usufructuario de parte de una cosa poseída en común **ejercerá todos los derechos que correspondan al propietario de ella referentes a la administración y a la percepción de frutos e intereses**. Si cesare la comunidad por dividirse la cosa poseída en común, corresponderá al usufructuario el usufructo de la parte que se adjudicare al propietario o condueño". 31 LPRA sec. 1529 (énfasis suplido).

**E.**

Para poder disponer de los señalamientos de error planteados por los hermanos Quirós López mediante el recurso de apelación que nos ocupa, es de particular importancia exponer ciertas disposiciones que estuvieron consagradas en la derogada Ley Núm. 21 de 20 de mayo de 1987, según enmendada, conocida

como la "Ley de Control de Acceso de 1987" (en adelante, la "Ley de Control de Acceso"), 23 LPRA sec. 64e *et seq.* (derogada) y su intención legislativa. Veamos.

La Ley de Control de Acceso fue aprobada con el fin de proveerles a los ciudadanos de nuestro País un mecanismo adicional para combatir la criminalidad y de promover la participación activa de la comunidad en la lucha contra el crimen. Jta. Residentes v. SLG Lora-Ayala, 206 DPR 248, 252 (2021). Cónsono con ello, la referida pieza legislativa establecía un procedimiento para que toda persona que residiera en urbanizaciones, comunidades o calles solicitara la instalación de un sistema para controlar el tráfico de vehículos en las calles de sus lugares de residencia. Íd., págs. 300-301.

Así, dicho estatuto les brindaba a los municipios de Puerto Rico la facultad de reglamentar y conceder permisos para el control del tráfico vehicular en las vías públicas de las urbanizaciones, siempre y cuando se cumpliera con los requisitos dispuestos en ley. En su parte pertinente, la legislación establece como requisitos para otorgar el permiso de acceso controlado los siguientes:

[…]

c) Que la solicitud de autorización para controlar el acceso o los accesos a la urbanización, calle o comunidad sea adoptada por lo menos por tres cuartas (3/4) partes de los propietarios de las viviendas allí establecidas. **La participación de dichos propietarios estará limitada a un propietario por vivienda y deberá constar por escrito bajo la firma de cada uno de ellos.** Una autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad **prestada voluntariamente por un propietario mayor de edad y en representación de una vivienda, obligará al propietario a cumplir con lo dispuesto en la Sección 10 de esta ley** y estará en pleno efecto y vigor mientras no se emita un documento escrito que claramente revoque la autorización prestada con fecha anterior. […] Aquellas personas que favorezcan la implantación del sistema, deberán hacerlo expresamente y por escrito, en el momento en que se lleve a cabo la gestión para obtener de los propietarios las autorizaciones necesarias para solicitar el permiso de control de acceso.

d) Que la comunidad se comprometa y presente garantías de que ha de asumir los gastos de instalación, operación y mantenimiento de las facilidades necesarias para el control del acceso a la urbanización o comunidad. 23 LPRA sec. 64a (derogada) (énfasis suplido).

Una vez se autorizaba tal petición y se instalaba un sistema de control de acceso, el consejo, junta o asociación de residentes quedaba facultado para imponer una cuota a los residentes de dicha urbanización para sufragar los costos y gastos de instalación, operación y mantenimiento de dicho sistema. 23 LPRA sec. 64d-3 (derogada). La derogada Sección 11 de la Ley de Control de Acceso disponía la obligación de pago de dichas cuotas y sobre quiénes recaía dicha obligación. En particular, establecía que:

> (a) El Consejo, Junta o Asociación de Residentes está facultada para imponer una cuota para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso, incluyendo los salarios o jornales del personal contratado. Asimismo, está facultada para cobrar dicha cuota y reclamar la deuda a un propietario por este concepto por la vía judicial.
>
> La obligación de pago recaerá en los siguientes propietarios:
>
> 1) Los propietarios de fincas en las que se haya inscrito la autorización o permiso bajo el procedimiento establecido en la Sección 8 anterior.
>
> 2) Los propietarios que autorizaron la solicitud para establecer el control de acceso, según fue implantado.
>
> 3) Todo propietario adquirente de una finca, ubicada en una urbanización, calle o comunidad que ha sido autorizada por el municipio correspondiente para controlar el acceso o que, a la fecha de la compraventa, se encontrara en trámite de obtener el consentimiento de tres cuartas (3/4) partes de los propietarios y así conste en actas. 23 LPRA sec. 64d-3.
>
> […]

En <u>Residentes Sagrado Corazón v. Arsuaga</u>, el Tribunal Supremo dispuso que el requisito de representación que establece la Sección 3, inciso c, de la Ley de Control de Acceso, necesariamente "*supone un acuerdo previo entre los propietarios del inmueble para que luego uno de ellos pueda emitir una sola autorización a nombre de los demás, o lo que es igual, que sea representativa de la vivienda*". <u>Íd</u>., págs. 315-316 (énfasis en el original). Para que la autorización sea representativa de la vivienda, el acuerdo de los copropietarios debe ser unánime "*o al menos mayoritario*". <u>Íd</u>., pág. 316 (énfasis en el original). "Sólo así un copropietario podría, con su voto o participación, sujetar el inmueble y obligar a los demás dueños a contribuir con el costo del sistema de control de acceso". <u>Íd</u>. Específicamente, el Tribunal Supremo concluyó que la autorización para que un inmueble quede sujeto a un sistema de control de acceso constituye un acto

de administración y mejor disfrute de la cosa común. <u>Residentes Sagrado Corazón v. Arsuaga</u>, *supra*, pág. 311.

Como consecuencia de lo anterior, el alto foro expresó que "la única manera en que un copropietario […] podía autorizar válidamente el establecimiento de este sistema y así sujetar la cosa común y obligar, con su actuación, a los demás copropietarios, *era si ese acto hubiese sido consentido por la mayoría de los partícipes.* **Es decir, por aquellos que representaban la mayoría de las participaciones en la cosa común**". <u>Íd</u>., pág. 312 (énfasis en el original y suplido).

**III.**

La contención principal que nos presentan los hermanos Quirós López se reduce a señalar que el tribunal *a quo* incidió al decidir que el consentimiento prestado por la señora López Ortiz, para la implementación del control de acceso, fue válido y suficiente en derecho. Para los Apelantes, el foro de instancia llegó a esta determinación basado en una interpretación incorrecta de las normas referentes al usufructo viudal, la comunidad de bienes y la Ley de Control de Acceso, *supra*. Razonan que la cuota viudal usufructuaria de su madre nunca le confirió participación propietaria sobre el caudal hereditario de su padre.

Además, añaden que el acuerdo suscrito por su madre constituyó un acto de administración que requería la aprobación unánime o, por lo menos, de una mayoría de los demás copropietarios, que a su vez tuvieran una mayoría de participación en la titularidad del inmueble, sin embargo, arguyen que eso no sucedió. Por ende, concluyen que el consentimiento brindado por la señora López Ortiz fue inválido e insuficiente para sujetar el inmueble en comunidad al sistema de acceso controlado y, a su vez, obligarlos al pago de los gastos y cuotas relacionadas.

Como parte de sus argumentos, los Apelantes también alegan que UNDARE nunca les notificó de la intención de establecer un control de acceso en la urbanización donde estaba situado el inmueble en comunidad. Por tanto, no existió un acuerdo o consulta con su madre sobre la firma del consentimiento, en contravención con lo dispuesto en la Ley de Control de Acceso, *supra*. Igualmente,

sostienen que tampoco existe un documento suscrito por éstos que autorizara el control de acceso.

Por estar estrechamente relacionados entre sí, discutiremos a continuación los errores señalados por los Apelantes de forma integrada.

Al examinar de *novo* las mociones de sentencia sumaria presentadas por las partes, sus respectivas oposiciones y la totalidad del expediente, hallamos que no existe controversia sobre los hechos materiales determinados por el foro de instancia en su *Sentencia Parcial*. También encontramos que la aplicación del derecho a la controversia fue correcta. Veamos.

Como mencionamos en la parte precedente, en una comunidad de bienes los actos de administración por parte de un comunero solamente obligan a los demás copropietarios cuando el acuerdo es por **mayoría**. Art. 332 del Código Civil, *supra*. Relativo a las controversias que nos ocupan, el Tribunal Supremo resolvió que la autorización para que un inmueble quede sujeto a un sistema de control de acceso constituye **un acto de administración y mejor disfrute de la cosa común**. Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 311. Atinente a lo anterior, el alto foro judicial estatal sostuvo que la validez de la autorización que se provea para establecer un control de acceso sobre una propiedad inmueble que forma parte de una comunidad, debe existir un acuerdo de los copropietarios unánime **o al menos, mayoritario**. Esto es así, puesto que el establecimiento del sistema de control de acceso es válido y obliga a todo comunero siempre y cuando el acto hubiera sido consentido por la mayoría de los partícipes o lo que es igual, **por aquellos que representaban la mayoría de las participaciones en la cosa común**. Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 312.

Contrario a los argumentos esbozados por los hermanos Quirós López, somos del criterio que la señora López Ortiz sí contaba con una participación mayoritaria en el inmueble común, al momento de autorizar la implantación del control de acceso en la urbanización Santa María. Nos explicamos.

Tras la muerte del padre de los Apelantes en el 1983, nació una comunidad de bienes postganancial formada por el total de los activos de la Sociedad Legal de Gananciales compuesta por la señora López Ortiz y su esposo, el señor Francisco A. Quirós Méndez. *Véase*, Art. 1315 del Código Civil, *supra*. La

participación de la viuda en los bienes de dicha comunidad era de un cincuenta por ciento (50%). No obstante, la señora López Ortiz también tenía una participación sobre la totalidad del caudal relicto en forma de usufructo viudal que, como bien adelantamos, gravaba la totalidad de los bienes hereditarios que componían la sucesión de su esposo.

Es un hecho incontrovertido que en este caso no hubo conmutación de la cuota viudal usufructuaria, liquidación de la comunidad post ganancial, ni partición del caudal hereditario del señor Francisco A. Quirós Méndez al momento en que la señora López Ortiz consintió al sistema de control de acceso en controversia. Por consiguiente, la totalidad de los bienes de la herencia se encontraban afectos al pago de la cuota viudal usufructuaria de la madre de los Apelantes. Así pues, en consideración a lo anterior, es incuestionable que la señora López Ortiz, como heredera llamada junto a sus dos hijos, tenía una participación del caudal de su difunto esposo, quien al momento de su muerte era el titular de un 50% del inmueble en cuestión. Asimismo, la señora López Ortiz era la dueña del otro 50% de dicha propiedad, pues la misma se adquirió estando vigente la sociedad legal de bienes gananciales entre ella y su esposo.

Habida cuenta de que el usufructuario de parte de una cosa poseída en común puede ejercer **todos** los derechos que correspondan al propietario de ella referentes a **la administración y a la percepción de frutos e intereses**, la señora López Ortiz representaba una mayoría de los intereses en el bien objeto de la comunidad. Distinto al caso de <u>Residentes de Sagrado Corazón v. Arsuaga</u>, *supra*, en el cual los comuneros tenían el mismo interés propietario sobre el inmueble ascendente a un 50%, en el caso de autos, la madre de los Apelantes tenía el 50% de participación correspondiente a su porción post ganancial más el usufructo sobre el 50% restante que le pertenecía a la sucesión del esposo finado de ésta. Queda claro, pues, que la participación de la señora López Ortiz sobre la cosa común representaba la mayoría de las participaciones sobre la misma y, por tanto, podía válidamente consentir al sistema de control de acceso pues este constituye un acto de administración y de mejor disfrute del bien en controversia. En otras palabras, la señora López Ortiz **representaba la mayoría de las**

**participaciones en la cosa común en controversia**. Residentes Sagrado Corazón v. Arsuaga, *supra*, pág. 312.

La madre de los Apelantes era dueña de la mayor participación de intereses sobre la titularidad del inmueble, por lo que era una propietaria de la vivienda que prestó su consentimiento expreso al control de acceso. A la luz de dicha realidad, no era necesario el consentimiento de los hermanos Quirós López, pues la anuencia de su madre al sistema de control de acceso fue válida, a la luz de la Ley de Control de Acceso, *supra*, y su jurisprudencia interpretativa.

En consecuencia, no erró la distinguida juzgadora de instancia al determinar que la madre de los hermanos Quirós López podía consentir a la implementación del control de acceso en la urbanización Santa María, ya que poseía un interés propietario mayor al de sus hijos. Reiteramos, por ser un acto de administración de la comunidad, la señora López Ortiz no necesitaba el consentimiento de sus hijos para suscribir el acuerdo, según requerido por la Ley de Control de Acceso, pues ésta ya contaba con un interés mayor al de los hermanos Quirós López sobre el inmueble en comunidad.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, *confirmamos* la *Sentencia Parcial* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

El Juez Salgado Schwarz disiente con opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| | | |
|---|---|---|
| FRANCISCO IVÁN QUIRÓS LÓPEZ; GERARDO ANTONIO QUIRÓS LÓPEZ<br><br>Parte Apelante<br><br><br>v.<br><br><br>UNDARE, INC.; ASOCIACIÓN DE RESIDENTES DE LAS URBANIZACIONES SAN FRANCISCO, SANTA MARÍA, SAN IGNACIO Y EXTENSIÓN SAN IGNACIO<br><br>Parte Apelada | KLAN202500047<br><br>Consolidado<br><br>KLAN202500049 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2020CV02962<br><br>Sala: 901<br><br><br><br>Sobre: Sentencia Declaratoria |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez.

**OPINIÓN DISIDENTE DEL
JUEZ CARLOS G. SALGADO SCHWARZ**

En San Juan, Puerto Rico, a 25 de febrero de 2025.

Me encuentro en la encrucijada de disentir de mis hermanos jueces en la decisión alcanzada, ya que tanto el resultado y su fundamento están totalmente alejados de la realidad jurídica que representa este caso.

Debemos llevar como bandera el hecho de que cuando muere el padre de los apelantes, estos últimos ya eran mayores de edad. Al advenir como herederos de su causante, dejó de existir una Sociedad de Bienes Gananciales donde su señora madre era representante, así que ya la toma de decisiones sobre el derecho propietario se dividió e identificó en dos partes separadas que constituyen cada una en un cincuenta porciento.

La cuota viudal usufructuaria no fue, en el pasado Código Civil de 1930, derogado en el 2020, una fuente de derecho

titular, o mecanismo de convertir a la viuda en heredera forzosa, como lo es posterior al 2020. En el pasado, para la fecha de la muerte del padre de los apelantes, la cuota viudal usufructuaria era una carga que grava el caudal hereditario hasta su liquidación. Al así disponerse, mientras no se liquide la comunidad hereditaria, la viuda tendrá derecho al uso y disfrute de la cosa que constituye y forma el caudal relicto a liquidar y/o distribuir.

Cuando los apelados cerraron las calles de la urbanización, le pidieron el consentimiento a la señora madre de los apelantes **únicamente**, por lo que obtuvieron el 50% de la aprobación dentro de la participación de ese inmueble. ¿Puede la dueña del cincuenta porciento obligar al otro cincuenta porciento sin la autorización de algún representante de dicha sucesión? Hagamos la pregunta de otra forma, ¿puede la misma señora hipotecar el inmueble sin la firma de los miembros de la comunidad hereditaria que comparte la titularidad del inmueble? La respuesta obligada es no.

El poder ejercer actos de administración sobre el inmueble no significa que pueda consentir en la toma de una decisión que a la larga puede afectar el patrimonio de éstos, ya que la deuda que advenga por esa decisión tomada **ya siendo los apelantes mayores de edad, herederos y, por ende, titulares comuneros del inmueble en cuestión**, sin la participación de ellos, afecta su caudal, hasta el punto en que podrían perder el inmueble en una ejecución de sentencia que proceda luego de algún trámite de cobro de dinero.

La controversia de este caso estriba en si la cuota viudal le añade algún porciento de titularidad a la viuda sobre el caudal de su fallecido esposo. Es la posición del suscribiente que no lo hace.

La apelada debió obtener la firma de uno de los dos apelantes allá en el siglo pasado para efectivamente obtener el consentimiento de los dueños del inmueble y resultar obligados al pago de cuotas de mantenimiento y acceder al cierre de la urbanización según la legislación aplicable.

Por lo anteriormente esbozado me aparto de la determinación de mis compañeros de panel, y muy respetuosamente, *DISIENTO*.


CARLOS G. SALGADO SCHWARZ
JUEZ DE APELACIONES